**THE GEORGE HYMAN CONSTRUCTION COMPANY, Plaintiff,**

v.

**Jackson D. GATEMAN, Anthony M. DeFeo, Charles G. Moretto, Christine Moretto, Calvesco, Inc. and Iron Holdings, Inc., Defendants and Counterclaimants.[1]**

**No. CIV. A. 95–10782–PBS.**

United States District Court,
D. Massachusetts.

Sept. 2, 1998.

1. Christine Moretto was dismissed as a defendant by the Court at the close of evidence on December 23, 1997. She continues to press her counterclaim with her father, Charles Moretto. Edward Zeytoonjian, who appeared pro se, was also dismissed from this case the same day.

Steven J. Comen, Jeremy M. Sternberg, Goodwin, Procter & Hoar, Dori C. Gouin, Goodwin, Procter & Hoar, Roy D. Toulan,

Jr., Stibel & Toulan, LLP, William A. Stibel, Stibel & Toulan, LLP, Boston, MA, for Plaintiff.

R. Robert Popeo, Kevin M. McGinty, Joseph P. Messina, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Peter B. McGlynn, Bruce D. Levin, Bernkopf, Goodman & Baseman, Joseph J. Balliro, Jr., Balliro & Mondano, Bernard Grossberg, Roy D. Toulan, Jr., William A. Stibel, Stibel & Toulan, LLP, Boston, MA, for Jackson D. Gateman, Anthony M. DeFeo, Jr., Charles G. Moretto, Christine Moretto, Edward K. Zeytoonjian, Calvesco, Inc., Iron Holdings, Inc., Defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT

SARIS, District Judge.

### INTRODUCTION

This case involves a mismanaged construction project. In August 1994, The George Hyman Construction Company ("Hyman") became the general contractor on a project to build a mail processing center in Waltham, Massachusetts for the United States Postal Service ("USPS"). Hyman subcontracted with a brand-new company, defendant Calvesco, Inc. ("Calvesco"), for demolition and site work scheduled to begin immediately. Within weeks and with Hyman's consent, Calvesco was replaced by a different corporation with the same owners, defendant Iron Holdings, Inc. doing business as Charles A. Jackson Co. ("Jackson"), which previously existed only as a shell. Site and demolition work proceeded apace, albeit without a signed subcontract or a payment and performance bond, both of which are normally required by Hyman. By February 1995, the "vendors," i.e. sub-subcontractors and suppliers, hired by Jackson had not been paid sums totaling in the hundreds of thousands of dollars. Hyman stopped paying Jackson, and Jackson walked off the site on March 1, 1995.

Twenty-six unpaid vendors, who together with their attorneys filled the courtroom, sued Hyman under the Miller Act, 40 U.S.C.

§ 270a *et seq.* Hyman brought this action. In the meantime, both corporate defendants, Calvesco and Jackson, effectively ceased to exist and defaulted. One individual with an ownership interest, Anthony DeFeo, defaulted as well and apparently is nowhere to be found. The other two principals of Calvesco and Jackson, defendants Jackson D. Gateman and Charles G. Moretto, are now all who remain. Hyman seeks to reach these two individuals for the contract and civil RICO liability of Jackson, obtained by default, on a corporate veil-piercing theory. Hyman also alleges claims against the individuals for common law fraud, indemnity and violations of the Massachusetts Consumer Protection Act, Mass.G.L. c. 93A, § 11. Moretto and his daughter Christine, for their part, move for judgment on their counterclaim that Hyman violated c. 93A by bringing this action, which they claim was frivolous and baseless.

After thirteen days of evidence, extensive briefing and argument, the Court *ORDERS* entry of default judgment for Hyman against the corporate defendants and entry of judgment for defendants Gateman and Moretto on all counts of the complaint. The Morettos' motion for judgment on the counterclaim is *DENIED*, and the Court *ORDERS* entry of judgment for Hyman on the counterclaim.

### FINDINGS OF FACT

The George Hyman Construction Company is a large, nationwide general contractor based in Bethesda, Maryland.[2] On August 31, 1994, Hyman was awarded a $27.8 million contract for the construction of a mail processing facility for the USPS in Waltham, Massachusetts (the "Post Office Project"). Work on the Post Office Project was scheduled to begin almost immediately, around mid-September 1994. One of the major "divisions" of Hyman's work on the Post Office Project was "site and demolition work," which involved removal of existing structures and preparation of the site for construction of the facility. Hyman's bid to the USPS incorporated a subcontract estimate for the site and demolition division of slightly more than $2.94 million, a bid which Hyman had

---

**2.** As of January 1, 1996, Hyman's name was changed to Clark Construction Company.

derived from subcontract bids from several of its regular site subcontractors in New England.

Within minutes after Hyman had submitted its final bid for the general contract to the USPS, James Finklea, Hyman's Chief Estimator for the New England and Midwestern Regions, received a faxed "unsolicited bid" from Calvesco to perform "Specific Demolition Work" and "Removal Work" on the Post Office Project for $1.05 million. Neither Finklea, who was in charge of solicitation, nor anyone else at Hyman had spoken to anyone at Calvesco about the Post Office Project. Interested in the low bid by Calvesco, Finklea telephoned the bid's point of contact, defendant Anthony M. DeFeo at Calvesco, in the early days of September and asked DeFeo to meet with him to discuss the bid. Before describing the relationship that ultimately brought the parties to federal court, Calvesco's brief existence prior to September 1994 bears recounting.

A. *Calvesco, Inc. in the Summer of 1994*

Calvesco was, at the time Finklea received the demolition bid on the Post Office Project, only in its fourth month of active operation. In May 1994, defendant Charles G. Moretto introduced defendant Jackson D. Gateman, a former business associate, to DeFeo. DeFeo was interested in starting a demolition subcontracting business. Though DeFeo had experience in that line of work, he had run into financial problems, including bankruptcy, with earlier contracts and needed financial backing. DeFeo and his father told Moretto that DeFeo had no ability to manage money and asked him for help in getting back into the construction business. Moretto agreed and recruited Gateman to get involved in a small business with DeFeo. The verbal understanding among the men was that Gateman and Moretto would each put up half the necessary funds but that profits would be divided three ways.

In contrast to DeFeo, Moretto and Gateman had no construction experience. They had each been involved in a variety of other kinds of businesses. Beginning in the early 1960s, Moretto, a high school dropout, had ownership interests in several gas stations, nightclubs, restaurants, apartment buildings and other real estate. He later opened a chartering company called Fleet Yacht Charters. His practice has been to hold most or all of his business investments in the name of a trust, a limited partnership or some entity other than his personal name. Gateman's prior business endeavors had been similar to Moretto's: insurance, gas stations, boats, real estate, restaurants and night clubs. In all of his businesses, Gateman has acted primarily if not exclusively as an investor. Moretto and Gateman did business together before in mortgage pools and real estate.

Gateman, Moretto and DeFeo agreed to use a "shelf" corporation, Calvesco, Inc., as the vehicle for their nascent contracting business. Calvesco had been incorporated about a year earlier by Moretto's attorney, Michael Yerardi, for a different client and had never been used. On May 26, 1994, Yerardi filed for Calvesco a Certificate of Change of Directors or Officers, which named Moretto as President, Gateman as Treasurer, Moretto's daughter Christine Moretto ("Christine") as Clerk, and Yerardi as Assistant Clerk. Moretto, Gateman and DeFeo were listed as the only Directors of Calvesco. According to stock certificates, Gateman and one of Moretto's entities, Clearwater Trust, each own one half of Calvesco. No actual stocks were issued to DeFeo, but in keeping with their oral agreement, DeFeo would get one-third of the profits of Calvesco, in addition to a salary for his work. There was no fraudulent purpose in the formation of Calvesco.

Calvesco initially set up shop at 164 Northern Avenue, Boston, in the offices of Moretto's Fleet Yacht Charters. Calvesco was initially and solely funded by "loans" from Gateman and Clearwater Trust (or other Moretto-controlled entities), as it would be throughout its short lifetime. Though no loan documents were executed, Calvesco's computer-generated check registers and the checks themselves referred to the payments as loans. The loans came with no established interest rate, and the owners drew no substantive distinction between the funding being "loans" or "investments." Going forward, Calvesco was to be funded on an "as-needed basis," with either one or the other

investor depositing money into the Calvesco checking account when the company required it. Gateman and Moretto controlled the flow of monies into and out of the corporation. Calvesco was initially funded with loans of $10,000 each from Gateman and from Moretto's Clearwater Trust on May 23 and June 3, respectively, and an additional $8,333 loan from Gateman on June 1.

DeFeo, who in addition to his profit sharing was paid as an "independent contractor" at a "salary" of $1,000 to $1,500 per week, got right to work. Shortly after working a small contract at the Woburn Bindery worth $7,000, he contracted on behalf of Calvesco to do site and demolition work at MIT, another small $75,000 job with a projected profit of $30,000. Emboldened by the successful undertaking of these two subcontracts, DeFeo approached Moretto later in June about his desire to submit a bid to the Torrey Company ("Torrey"), a general contractor, on a much larger job: demolition of an existing building and site work, excavation work, paving and landscaping on a project to build a Home Depot store in Waltham, Massachusetts.

Though Gateman and Moretto were reluctant to expand so quickly the scope of Calvesco's work solely on DeFeo's word, they agreed to bid on the project if it was first reviewed by Edward Zeytoonjian, a longtime friend of Gateman. Zeytoonjian had extensive experience in the construction industry, and that experience, largely in heavy earth-moving and construction, complemented DeFeo's, which was primarily in demolition. Zeytoonjian reviewed DeFeo's proposed $1.3 million bid and agreed that the subcontract would turn a profit of about $200,000. Additionally, Zeytoonjian estimated that the project could potentially provide Calvesco with the opportunity for profitable "extra" work, that is, work above and beyond the original subcontract price and specifications.

Torrey awarded Calvesco the Home Depot subcontract on June 20, 1994. As required by Torrey, Calvesco obtained a bond for the job, but both Gateman and Moretto had to sign as personal indemnitors to get it. As with the earlier projects, DeFeo managed the Home Depot Project in the field, where Moretto and Gateman were rarely involved. Zeytoonjian joined DeFeo in the field on the Home Depot Project as a part-time "independent contractor" in July 1994, but he quickly became devoted full-time to the project.

Soon after the Home Depot project began, the scope and dollar value of the contract increased dramatically due to DeFeo's success in convincing Torrey that the removal of ledge (i.e. solid rock) from the Home Depot site should be charged as an extra. As a result, the total contract cost extraordinarily rose from $1.3 million to approximately $5.3 million. Calvesco's expected profit margin on the roughly $4 million in extras was 50%, or approximately an extra $2 million in profit on top of the $200,000 expected on the contract itself. The work of Calvesco's rock-crushing sub-subcontractor, Ferreira Construction, alone resulted in an additional profit to Calvesco of $1.1 million. This extra work created tons of processed gravel, the product of the crushed ledge, which was stored on the Home Depot site.

Moretto ran the Calvesco office. Gateman, a self-proclaimed "passive" investor, spent most of his time at the Comedy Connection, one of his nightclubs, and had no defined duties in the office or on site. As might be expected, the Calvesco office, without experience in construction, struggled to keep up with the pace of expansion. Calvesco initially set up its office during the summer of 1994 with several "girls," including Moretto's daughter Christine Moretto ("Christine"), to keep track of the payroll and vendors due money on the Home Depot project. A graduate of Wheaton College, Christine had worked as a part-time administrative assistant at Fleet Yacht Charters. She had secretarial but no financial background. ADP, a well recognized payroll processing company, was hired to do the payroll. Calvesco's accounting system was rudimentary during this early period. Its only operative record was a check register, for which Moretto assumed day-to-day responsibility and at which Gateman rarely peeked. The check register was maintained through the software program "QuickBooks 3.0," which was capable of tracking several different companies in dif-

ferent computer files. Often, checks were written on the Calvesco account but not distributed until either Moretto or Gateman "loaned" more money to Calvesco, resulting in frequent negative balances in the check register.

Moretto himself referred to the records at Calvesco's office as "mishegas," or "mess," and Gateman described the files as being in a state of some "confusion." Moretto relied on DeFeo's word and input from other sources, including Zeytoonjian and a manager at Torrey, to check periodically the progress of the projects. Moretto admittedly relied on his "personal comfort level" with the way these projects were going from week to week as he made financial decisions for Calvesco. During the summer, Calvesco hired an accountant, who observed that the company did not have sufficient control over its finances and recommended changes including cost accounting, but, due to personality conflicts with Moretto, he quickly left Calvesco. Three or four other accountants met with Calvesco during the summer of 1994, but none was hired. By August "there were a lot" of invoices coming in, and the office was understaffed and unorganized. Zeytoonjian began working out of the Calvesco offices instead of on site at Home Depot.

Moretto and Gateman, as agreed, provided a steady stream of capital through the summer of 1994. Beginning with the $10,000 loan on May 23, Gateman put $91,105.50 into Calvesco before August 23, 1994. Moretto, during the same time period, loaned Calvesco $84,999 through Clearwater Trust. Additionally, Moretto borrowed $100,000 short-term to lend to Calvesco in August 1994. The money received by Calvesco was deposited by Gateman and Moretto in relatively small amounts: up until August 23, Gateman made eleven separate "loans" to Calvesco ranging from $1,200 to $15,000, while Moretto made six separate "loans" ranging from $10,000 to $23,333.33. All monies invested in the company continued to be termed "loans."

Despite the confusion in the financial record keeping of the new company, Calvesco performed its several subcontracts without incident through the summer of 1994. On August 23, Calvesco received its first check from the Torrey Company in the amount of $376,000 for work on the Home Depot project. Subsequently, after four months of operation, Calvesco's owners decided that there was sufficient money in the company to allow some payback of their loans. The first payments to Gateman and Moretto were made on August 25 and August 30, with Gateman receiving $71,321 and Moretto $35,000 in "loan repayments." DeFeo, meanwhile, had been receiving payments from the get-go, having been paid over $36,000 by the end of August 1994. A portion of these funds was cash for salary and the rest was payment by the company of personal expenses such as hotel bills and cellular phone charges. All such personal expenses, however, were considered to count against the equal profit DeFeo was to receive from the company. All amounts taken from Calvesco in whatever form were documented in the Calvesco check register.

In August, at about the same time that DeFeo was expressing interest in the Post Office Project, he also was negotiating for a second major subcontract with the Torrey Company. This one involved work on the construction of a Wal-Mart in Lynn, Massachusetts similar to that on the Home Depot project: demolition of a building and subsequent preparation of the subsurface and surface of the site. Zeytoonjian prepared a base bid of $950,000, which included an expected profit margin of approximately 10%. Torrey and Calvesco entered into the Wal-Mart subcontract on September 1, 1994. Because Torrey also required that job to be bonded, Gateman and Moretto had to personally guaranty the payment and performance of the subcontract, as they had the Home Depot project.

With Calvesco's business growing by leaps and bounds, the company moved its offices to 88 Broad Street in downtown Boston in late summer 1994. Money was finally flowing into the company. In addition to the August 23 payment, Torrey made two more payments in September on the Home Depot project: on September 2 for $260,654 and on September 17 for $518,630. Gateman and Moretto were paid back their start-up loan amounts in full on September 21. Though

each would make several smaller loans to Calvesco later, each remained comfortably in the black on their personal investments in Calvesco from that point forward. As of August 31, 1994, Calvesco was earning a gross profit of 55 percent. According to defendant's expert Howard M. Newberg, it had an assets to liabilities ratio possessed by the strongest members of the construction industry.

## B. *The Post Office Project Begins*

Just before Gateman and Moretto reached their break-even point on their investment in Calvesco, DeFeo and Zeytoonjian met Finklea at Hyman's Boston office on Thursday, September 8, 1994 to discuss the last-minute unsolicited bid DeFeo had sent to Hyman for demolition work on the Post Office Project. Bernard Morrissey, the Regional Manager of Hyman's Northeast Division, was also present at the meeting. Finklea, aware of Calvesco's stash of gravel at Home Depot, told DeFeo and Zeytoonjian at the meeting about the possibility of a "claim for extra work" on the Post Office project involving the expected discovery of about 25,000 cubic yards of unsuitable soils that would have to be removed and replaced. Finklea revealed to Calvesco the extra to "make the job more attractive to" Calvesco and to induce a lower bid from it. DeFeo told Finklea that Calvesco could bond the job and indicated his desire to expand Calvesco's bid to perform site work in addition to demolition. The meeting adjourned after Finklea asked DeFeo quickly to revise his bid to include a price for site and demolition work together.

DeFeo and Zeytoonjian informed Gateman and Moretto over the weekend after the September 8 meeting about the potential site and demolition job on the Post Office Project. Zeytoonjian told the others: "You are stepping into the big leagues, you are going to work for a real big contractor . . . . [Y]ou ha[ve] to dot your I's and cross your T's." Gateman initially did not want Calvesco to get involved because of the fact that the Hyman job was a government and union contract. Moretto also was hesitant, but he and Gateman "reluctantly acquiesced to go forward with the project."

Calvesco, using the work of Zeytoonjian over the weekend to prepare the additional bid for site work, faxed a revised subcontract bid on Monday, September 12, 1994 for $2.95 million, which was roughly the same as the other bids received by Hyman before it had won the general contract. Finklea balked at the number in a phone conversation with Zeytoonjian and suggested $2.8 million. DeFeo then took over the conversation and agreed with Finklea, by phone, to a site and demolition subcontract price of $2.8 million, or $142,000 less than the estimate for that division incorporated in Hyman's general contract bid. Finklea personally considered the bid price of $2.8 million to include a "performance and payment bond." Zeytoonjian expected a profit of approximately $400,000 on the agreed subcontract price.

Hyman did not demand financial statements from Calvesco, but they did run a Dun & Bradstreet credit report on the company sometime in September. Hyman had conducted a cursory investigation of Calvesco's background, primarily by sending a Hyman representative to the Home Depot project site to view Calvesco's work. Though no one at Hyman spoke to anyone at Torrey, Calvesco received a positive reference from Southworth–Milton, its lessor of heavy equipment. Hyman also had learned about Calvesco's stash of screened gravel during this tour.

Finklea sent two copies of the detailed subcontract agreement to DeFeo at Calvesco on September 16, 1994, asking DeFeo to return an executed copy within ten days. Expressed in the cover letter to the subcontract was the caveat that "Your compliance with the above will enable us to place your future payment requisitions in line for payment." The subcontract contained the following key provision:

> Subcontractor shall insure that all lower-tier subcontractors and employees, at all times, are timely paid all amounts due in connection with the performance of this subcontract. After the first partial payment hereunder, Hyman shall have the right to withhold any subsequent partial payments until subcontractor submits evidence satisfactory to Hyman that all amounts owed in connection with perfor-

mance of this subcontractor have been paid.

The subcontract would never be signed or returned.

Meanwhile, Calvesco immediately began working on the Post Office Project. Zeytoonjian was in charge of the day-to-day operation of Calvesco's work and reported to DeFeo, who also was supervising the two Torrey projects. Erin DeBruyn was Hyman's "project manager" for the Post Office Project and had daily contact with Zeytoonjian and frequent contact with DeFeo. The relationship between DeBruyn and Zeytoonjian was amicable. DeBruyn, 28 years old at the time, was beginning her first assignment as a Hyman project manager and reported to Morrissey, the regional manager, who was also frequently onsite. DeBruyn did not deal with either Gateman or Moretto, who both had only minimal personal contact with any Hyman representative throughout the relationship of the parties. Without question, DeFeo was viewed by Hyman as the man in charge of the Calvesco subcontract.

## C. The Union Problem and the Switch to Jackson

The first of the Project's many problems developed within two weeks. Because Hyman had collective bargaining agreements with trades involved in site and demolition, DeFeo had orally agreed that Calvesco's work on the Post Office Project would be performed by union labor. The unions, however, subsequently refused to allow Calvesco a "job only" agreement, which would have allowed Calvesco to use union labor on the Post Office Project without using exclusively union labor on its other projects. Calvesco, which had never used union labor, did not want to sign a general union agreement because, if it had to do all of its work union, it would lose its "bread and butter work" on the Home Depot site.

DeFeo and Zeytoonjian told DeBruyn about the union problem in late September 1994. DeFeo told DeBruyn that he could solve the union problem by substituting another company for Calvesco. DeBruyn called Morrissey to ask him if that would be acceptable to Hyman, and Morrissey, who thought the substitution was a "solution" to the problem, said: "As long as it is the same deal, the same people, a bond and all the same things we already agreed to, it doesn't matter to me what they call themselves." Within days, Hyman had fully endorsed the change of corporations doing the site and demolition subcontract under this "double breasting" arrangement, which is relatively common in the construction industry. Finklea himself had "no particular reaction" to the change and assumed the deal would be the same. Wilson Shook, the Executive Vice President of Hyman, also was aware of the double-breasting arrangement.

Soon thereafter, Zeytoonjian informed DeBruyn and Morrissey that "Charles A. Jackson Company" ("Jackson") would be doing the site and demolition work. Morrissey again raised no objection so long as they tried to get a bond. DeBruyn had no problem with it either because she "just wanted to get the work started." Hyman did not run a Dun & Bradstreet report on Jackson. Shook "told [DeFeo] to change the name on the subcontract agreement [which Calvesco had not yet returned] to Jackson; line out Calvesco, fill in Jackson, sign it, and return it." DeFeo agreed, but never did it. Soon thereafter, on September 27, Zeytoonjian signed a union agreement with the International Union of Operating Engineers Local 4 as "Vice President" of Jackson. A crisis had been averted, and work on the Post Office Project continued unabated.

The corporation that DeFeo proposed to use was actually named Iron Holdings, Inc., a corporation previously formed by DeFeo for another purpose. The company name used on the Post Office Project was derived from a combination of the first names of the three principals: "Charles" Moretto, "A." DeFeo, and "Jackson" Gateman. The formalities associated with the new company were slow and incomplete. A Certificate of Change of Directors or Officers was filed on October 21, 1994, naming Moretto as President, Treasurer and a Director and Gateman as Clerk and a Director. Christine Moretto was Assistant Clerk. Jackson established a separate bank account from Calvesco, had a different federal identification number and

had a separate payroll account. Jackson did not then, or ever, sign the subcontract with Hyman for the Post Office Project. No d/b/a certificate was filed on behalf of the company. The named shareholders of Jackson, according to stocks issued November 16, were Christine Moretto, Charles Moretto's daughter, and Laurie Gejawski, Gateman's daughter, but neither of them exercised any control over the corporation and functioned as straws for their fathers.

The basic setup of Jackson indicates that the lines between it and Calvesco were at best blurry. Jackson operated out of the same offices as Calvesco at 88 Broad Street. There was only a single phone line, registered with the phone company in the name of "Jack Gateman d/b/a Calvesco," and the phones were answered "Corporate Offices." Most of the employees were paid by only one company, but worked for both. For example, Christine Moretto acted simultaneously in the same administrative capacity for both Jackson and Calvesco. However, she was an employee of and was paid only by Calvesco, from which she received a W–2. The companies shared bookkeepers during the last few months of 1994. Zeytoonjian thought Jackson "was the same company" as Calvesco throughout the period he was connected to it. In fact, the majority of his compensation for his work on the Post Office Project came from Calvesco.

Gateman, Moretto and DeFeo agreed to finance Jackson "as it was necessary" from "the excess money that was in Calvesco until such time as the Hyman requisitions were paid." Like the transfers from Gateman and Moretto to Calvesco, all of the funds transferred from Calvesco to Jackson were termed "loans." Similarly, there were no loan documents, promissory notes, established interest rate or payback period for any of the loans. The principals agreed with each other that "before we would take any loan pay backs for money that we funded [Jackson] with that there were provisions to make sure that all the vendors were current, or would immediately be current, and part of that would be looking at the invoices from the vendors" and "requisitions due from Hyman."

The first loan from Calvesco to Jackson occurred on September 26, 1994 in the amount of $20,000. Calvesco made weekly loans, totaling $339,000, to Jackson from the beginning of October until mid-November, the first time Calvesco reclaimed any funds from Jackson. During this period, no funds were transferred from Jackson to either Moretto or Gateman. Calvesco made a total of nineteen separate small loans to Jackson between September 26 and January 26. There is no evidence that Hyman had any knowledge of, or expressed any interest in, the financial structure of either company.

### D. The Next Problem: No Bond

As it searched for a bond for the Post Office work, Jackson discovered that it could not obtain one without personal guaranties. Gateman and Moretto, liable for bonds on both Torrey projects, agreed that they, as individuals, "didn't want to sign any more or guarantee any more bonds." Gateman, specifically, did not want to sign either performance or payment bonds because he "was on $7 million worth of bonds at that time and that was as far as I wanted to go."

DeFeo told Finklea, Shook and Morrissey at a meeting in Hyman's Boston office in early November 1994 that Jackson would be unable to get a bond for the project as Finklea had required. This inability came as no surprise to Morrissey, but, according to him, "by that time the job was pretty well underway. We were both committed." DeFeo asked if there was any other way to get around the requirement. Though no one at Hyman investigated the bonding history of either Calvesco or Jackson, Shook suggested that Hyman could increase the amount of retainage from ten to twenty percent. "Retainage" is a percentage amount of a contractor payment withheld from each requisition payment to its subcontractors as a form of security. Hyman agreed at the meeting to waive the requirement that Jackson obtain a bond after calling DeBruyn to ensure that Jackson was performing. Though Hyman had used this procedure in the past, this offer was "special" for this particular subcontract and was not in line with any Hyman corporate policy.

The absence of a bond necessitated increased focus on Jackson's performance, especially its vendor payments. As a condition of the waiver, therefore, DeFeo agreed that Hyman would more proactively monitor vendor payments before it paid Jackson on the subcontract. Finklea and Shook specifically instructed DeBruyn that day "to get a list of the subs ... and suppliers, and to monitor payments to be sure that they were getting paid." DeBruyn shortly thereafter confirmed with Zeytoonjian on the site that Hyman would be checking monthly on the payment status of Jackson's vendors because its subcontract was unbonded.

Additionally at the November meeting, Shook suggested the possibility that Hyman might issue jointly-payable checks to Jackson's vendors at some point during the performance of the subcontract as a result of the waiver of the bond requirement. DeFeo "generally agreed" to the possibility of joint checks, but the parties reached no specific agreement about when, how, and under what circumstances joint checks would be issued. DeFeo also agreed to make a written change in the subcontract about the higher level of retainage. As before, however, DeFeo never sent an executed subcontract, with or without changes, to Hyman.

### E. The Early Requisitions

In accordance with its business practice, Hyman paid its subcontractors after reviewing and approving a completed standard requisition form submitted by each subcontractor. The requisitions typically were submitted monthly for the previous month's work, i.e., each requisition covered a specific work period. To each requisition was attached a "Continuation Sheet" that contained the bid amount for each portion of the particular subcontract along with an estimate of current percentage completion in each portion, which was then tallied to arrive at the total requisition figure. Hyman's practice was to review the subcontractor's requisition and, if it was acceptable, to approve the amount for payment, less any

agreed-upon retainage. Hyman, which operated on a "pay-when-paid" basis, would typically issue checks to its subcontractors seven to ten days after it received payment from the owner, in this case the USPS.

Jackson submitted two requisitions to Hyman on November 4, 1994 by walking them over to the Hyman office trailer, which was only about 50 feet away from the Jackson trailer on the Post Office site. Requisition 1 covered the work period from the beginning of the Project[3] until October 19, 1994, and Requisition 2 was for the abbreviated work period October 19 through November 4, 1994. The standard requisition forms each contained, above the subcontractor's signature block, a "Certificate of the Subcontractor." In addition to certifying that the work requisitioned had actually been performed, this contained the following language:

> I also certify that payment, less applicable retention, have been made through the period covered by previous payments received from the contractor, to (1) all my subcontractors (sub-subcontractors) and (2) for all materials and labor used in or in connection with the performance of the Contract.

Zeytoonjian signed both requisitions and had them notarized. He called into the 88 Broad Street office "to make sure everything was okay with the bills" before submitting the requisitions. Hyman, obviously, had never made a "previous payment" to Jackson at the time of the first and second certifications. Pursuant to the bond waiver agreement, Jackson also submitted on November 4 a list of "Charles A. Jackson" creditors, which included Calvesco and four vendors.

DeBruyn's assistant, Lauren Frei, verified that same day that all listed vendors had been paid. DeBruyn, pleased with Jackson's work, approved Requisition 1 without modification on November 4 by initialing the form and writing "OK TO PAY $487,200.00" in a large bubble in the center of the form. Hyman paid Jackson the full amount of Requisition 1, its first payment on the subcontract, on November 10, 1994. Requisition 2 was

---

3. The beginning of this work period is inexplicably listed on Requisition 1 as September 6, 1994, before Finklea and DeFeo met.

not immediately approved because it represented a later work period.

Before Hyman could pay Jackson, several automatic holds on payment had to be affirmatively overridden because of the special circumstances of the deal. According to Hyman company policy, payment to subcontractors is automatically held by corporate headquarters in Bethesda if three pieces of information about a subcontract are not logged in the central computer: (i) when a subcontract was signed; (ii) when a suitable bond was issued; and (iii) when insurance certificates were placed on file. Jackson submitted appropriate insurance certificates but had not met the other two requirements.

Technically, only Shook, the regional executive officer responsible for the Post Office Project, had the authority to "waive" the unfulfilled requirements. In practice, lower officials such as Morrissey actually could lift the holds, and in this case that is what happened. Morrissey lifted both administrative holds on payment to Jackson because, in his opinion, Jackson was performing satisfactorily. Though Finklea "wasn't too happy" about the amount paid to Jackson without a signed contract, it had "happened before." As a practical matter, Hyman often let work by a subcontractor begin without a signed subcontract. It was not uncommon at Hyman for subcontracts, especially those with "somebody you've never done business with before," to go unsigned for two or three months, and sometimes as long as eight or nine months.

### F. Suddenly Rolling in Cash: November 1994

On November 10, the same day that Hyman paid Jackson on Requisition 1, Jackson wrote Calvesco a check for $352,332 as a "loan payback." [4] On the same day of the loan payback, Moretto signed three checks on the Calvesco account, totaling $252,390, to the order of South Palm Beach Financial Corporation. The checks represented an initial investment by Calvesco in Joseph's Restaurant in Florida, including first month's rent, security deposit and construction costs.

At the same time, Calvesco was taking in sums of money unprecedented in its short life. The Home Depot project alone paid Calvesco almost $2.1 million, nearly half the final $4.5 million gross on the subcontract, during the five-week period between October 28 and December 2. Beginning November 4, Calvesco was also receiving money on the other Torrey project—Wal-Mart. The Wal-Mart project brought in $578,700 gross in November alone.

Moretto, Gateman and DeFeo also received some cash "off the books" from the sale of scrap metal from the Post Office site over the last several months of 1994. Moretto received $42,500 and Gateman approximately $53,000 in income from scrap metal in 1994. Though Gateman acknowledged the metal came from demolition on the Post Office "site," he rationalized that it had nothing to do with the Post Office Project and therefore nothing to do with Jackson.

Requisition 2 on the Post Office Project was approved by DeBruyn, also without modification, on November 21. In tandem with the second requisition, Jackson gave DeBruyn another handwritten list of vendors, each of which DeBruyn or her assistant, Frei, called to verify that there were no payment problems. On December 5, Jackson deposited a check from Hyman for $515,200, which represented payment on Requisition 2, less 20% retainage.

### G. Revamping Financial Controls at the Corporate Offices

With income and business growth now exponential, the casual financial record keeping system at Calvesco and Jackson quickly regressed from stressed to overwhelmed. Through the fall of 1994, Moretto continued to keep track of matters as best he could, acting on behalf of Jackson in much the same way he had on Calvesco's behalf. For both companies, he signed checks and purchase orders, talked to vendors and ensured that

---

4. On November 10, Calvesco also loaned Jackson $60,000, so the net transfer to Calvesco was actually $292,332.

each had enough money to operate, including paying its vendors. With three major projects—the Post Office, Wal–Mart and Home Depot—underway, the office structure struggled to stay afloat.

The companies did not have a so-called "job-costing" system in place to monitor their financial status. Moretto was slow to follow the advice of Gerald Eidelman and Herbert Rodman, accountants hired in the summer of 1994, to implement a system which would keep daily cost and expenses recorded by job. A job-costing system records the progress of a given construction project against project receivables to determine income earned. It also tracks the expenses of the project against the bid price. The basic purpose of a job-costing system is to determine whether the company has adequate cash for current and future expenses and whether any money can be distributed to owners before the project is completed. At least until December 1994, the companies operated on a cash-basis, relying on check registers and Moretto's judgment. Bank statements were also available, but there is no evidence that anyone in either company relied on them until December. Moretto claims to have relied on handwritten "projections" and estimates produced by DeFeo which indicated what kind of cash flow would be necessary to fund Jackson as work was being performed on the Post Office Project. Moretto found DeFeo's estimates to be "really right on the numbers and very, very accurate." However, all of the handwritten projections have disappeared, apparently removed from the offices by DeFeo in February 1995.

Moretto also relied on three separate "profit and loss statements," which his daughter Christine routinely updated and printed out of the computers in the corporate offices. The statements simply constituted sorted data from the companies' check registers. One included combined data for all inputs from both companies into the computer, but the other two represented profits and losses, individually, for Calvesco and Jackson. The Calvesco profit and loss statement includes a number of enumerated expenses relating to the Post Office Project, including concrete disposal, equipment rental, hay ba-les, independent contractor fees, office equipment and payroll. Similarly, several expenses related to the Home Depot project appear on the Jackson profit and loss statement. Christine Moretto pinned blame for this mix-up on "categorizing error."

Around the time of the payment of the first requisition, Gateman became concerned that the record keeping system at the Calvesco/Jackson office needed revamping. He brought in his acerbic sister-in-law, Linda Hill, as a bookkeeper for both companies on December 1, 1994. Hill has known Gateman for over 30 years and had acted as a bookkeeper for several of Gateman's business interests, primarily restaurants. Hill is not an accountant, and she had no previous experience in the construction business. She was hired as a "full charge bookkeeper" with the consent of Moretto, but her primary initial duty was to establish an accounts payable ledger, i.e. an aging report. Like Christine, Hill was an employee of Calvesco, not Jackson.

When Hill started working at the office, she found the check registers of the two companies to be "meaningless" and a "bunch of garbage" and the records to be generally a "mess" containing "huge errors." Hill essentially started from scratch in generating a "true" accounts payable list. Hill implemented a new computer program, "One–Write," for tracking the finances of Calvesco and Jackson. She installed an even more sophisticated program, "MAS 90," in December 1994, but it was never implemented because Hill insisted on first developing all other aspects of a "chart of accounts." Hill found confusion over which vendors were owed how much money, when, and for what jobs. Hill was, however, over the course of her ten weeks of employment (terminating February 17, 1995), able to construct an accounts payable ledger that she considered reliable.

Once Hill was hired, the accounting system became somewhat more formalized. Invoices for the different jobs were placed in different piles on a desk in the Calvesco/Jackson offices. Hill would input information from the computer into the One–Write system. As many as three times per week, Hill produced aging reports detailing which vendor bills

were due. There were, on occasion, insufficient funds to cover the checks that Hill wanted to issue. As a result, signed checks were often held until more money was available. Sometimes, however, signed checks were distributed before anticipated receivables were received based on the expectation that money was coming in very soon.

## H. *Extras and Delays at the Post–Office Job Site*

Back at the job site, Jackson began as expected to encounter peat, a wet, nonstable material that need to be removed and replaced with gravel to prepare the site for construction. There was not enough processed gravel on the Post Office site to replace the peat, so Jackson trucked it in from off-site, primarily from the stockpile at the Home Depot site. Calvesco wrote "credit change orders" worth $247,000 to Torrey for the gravel it took off of the Home Depot site; in other words, Calvesco reduced the amount of its contract price by that much because of the gravel it removed. There is no evidence of the market value of processed gravel at that time other than the Torrey credit change orders. None of this work was covered by the initial job specifications, therefore payment had to be separately negotiated via change orders.

Hyman submitted a change order request regarding the peat removal and gravel replacement to the USPS, which ultimately, on May 10, 1995, paid Hyman an additional $259,875 for work on that extra. Of that amount, $232,250 was allocatable for payment to Jackson, which by then was long gone from the scene and would never receive payment. The unsuitable material was only one of several Hyman change orders referring to work performed by Jackson. The total amount of these changes was in the range of $400,000 to $430,000, none of which was ever paid to Jackson.

On or about December 8, 1994, asbestos was discovered in one of the buildings onsite that was part of the demolition portion of its contract. All work in that particular building, including Jackson's demolition work, stopped at this point. The Post Office ordered all Hyman personnel and their subcon-

tractors out of the building, and Hyman would later claim $1.2 million in delay costs. Jackson was never able to go back into the building before its termination on March 2, 1995. There were other environmental problems as well, including the discovery of lead paint in the same building and another work room and contaminated water found on the site. Jackson raised the issue of delay claims with Hyman shortly after the discovery of asbestos and the other environmental delays. Zeytoonjian estimates Jackson's delay claim at 10% of Hyman's, or $120,000, but no payments for delay were ever passed on from Hyman to Jackson either.

On December 16, 1994, Jackson submitted Requisition 3 to Hyman for $287,000 for the work period of November 4 through December 16, 1994. Additionally, Jackson submitted to DeBruyn an expanded list of "project vendors" so that Hyman could check the progress of payment in accordance with the bond waiver. Either DeBruyn or Frei did at least some checking. In the requisition, Zeytoonjian, as "V.P." of Jackson, certified that all of Jackson's vendors had been paid through the end of the previous requisition's work period, November 4. Bills were in fact substantially current as of that date. Before signing the certification, he told "one of the people in our office trailer to call the main office to make sure that everything was okay with the bills." Zeytoonjian did not know of any vendors who had not been paid through November 4. There is no evidence that Gateman or Moretto personally supplied any vendor information to the jobsite, directly or indirectly.

Requisition 3 was especially significant because, with the approval of DeBruyn, its dollar request included payment for some work that, technically, had not been completed yet. Jackson's agreement to perform the extracontractual work such as peat removal "was costing them money," and Jackson was unable to proceed on the regular contract work. Because, "frankly, they [Jackson] could have just stopped and waited for an executed change order," DeBruyn "kind of put a little bit more money in Jackson's line item so that [she] could pay them a little bit more money up front to compensate for the

fact that they were performing extra work and didn't have an executed change order to bill to." No one at Hyman or Jackson could quantify the exact amount of Requisition 3 allocatable to subcontract work versus extra work, but whatever padded compensation was built into Requisition 3 fell well short of the total amount of the extra work performed and delay costs incurred by Jackson.

## I. *From Rumblings to a Roar*

Some of Jackson's Post Office Project vendors, whose payment problems were being documented by Hill, began complaining about nonpayment by the tail-end of 1994. Christine, who was in the corporate offices virtually every day, says that Jackson began having trouble paying vendors in late December 1994 or early January 1995 and that the problems were extreme by mid-January. She testified, "At that point within the office, the phones would be ringing off the hook and vendors would be looking for money."

Both Moretto and Gateman were aware of Hill's work and the problems she discovered. On January 5, 1995, while Hill was still verifying accounts payable with each vendor, she produced an "Accounts Payable Aging Report" for Calvesco and Jackson together. She did not then, or ever, produce separate hard copy reports for the two companies. The report shows accounts payable as of January 5 of over $1.5 million for Calvesco and Jackson *combined*, about half of which was "current" and 7.7% of which was due over 60 days. Hill printed updated aging reports at least once a week. Her January 18 report indicates roughly stable accounts payable for the combined enterprise of over $1.4 million, again showing about half current but, by then, 15.2% due over 60 days. As she called each vendor, some were angry about not having been paid. She sometimes had difficulty determining which invoices belonged with which job, especially for vendors such as Southworth–Milton, which leased equipment to both Calvesco and Jackson.

Just as the vendor problems were becoming apparent, Jackson's key personnel were paying less attention to the corporation's affairs. On or about New Year's Day 1995, Zeytoonjian was hospitalized for two weeks

and did not return to work until about January 19 or 20. He would again be hospitalized for the first several weeks of February. DeFeo, meanwhile, was increasingly erratic and hard to find as January wore on, likely due to a drug and/or alcohol addiction observed or suspected by, at a minimum, Christine, Gateman and Zeytoonjian. Christine was on vacation from New Year's until mid-January, and Moretto, who was in Hawaii for part of the month of January, claims not to have been in the office more than a "short period of time" in January and February.

Amidst all of these absences, Gateman "decided that [he] did not want to be involved in [ ] Calvesco or Iron Holdings and [he] consulted an attorney and [he] made an arrangement with Mr. DeFeo." The "arrangement," basically, was that Gateman would ensure that the Home Depot and Wal–Mart jobs were "finished." Among the factors motivating Gateman's departure was that Gateman "resented that [his] two associates bought $300,000 worth of cars and never informed [him] of it or leased or whatever." In fact, Moretto had leased an expensive Mercedes and DeFeo a Ferrari with corporate funds.

Perhaps oblivious to this disarray and the quickly darkening vendor storm clouds, DeBruyn authorized the release of payment on Requisition 3 to Jackson on January 13, 1995. Jackson deposited a check for $229,600 in its bank account on January 17, 1995. DeBruyn authorized the release of the payment to Jackson after researching the payment of Jackson's vendors appearing on the list provided by Jackson. Despite finding that Jackson was at least $110,000 behind in vendor and labor payments on the Post Office Project at the time, DeBruyn authorized the release because "they [at Jackson] were absolutely screaming for money." This requisition payment, which covered the work period ending December 16, would be the final payment Hyman made directly to Jackson.

On the same day that DeBruyn released Requisition 3, a check for $129,600 was written on Jackson's account for a "return of loan" to Calvesco and deposited in Calvesco's bank account. Though the signature reads "Charles G. Moretto," Moretto claims that the signature on the check is not his. The

signature is noticeably different from his signature on other documents. Regardless of who signed the check, Moretto and Gateman knew about it and ratified the transaction, which gave the loan payback to Calvesco priority over Jackson vendors with overdue bills. The check transfer left only $100,000 in the Jackson account to be paid to the vendors from Requisition 3, which was markedly lower than the first two requisitions. Importantly, however, there is no evidence that any of the $129,600 transfer from Jackson to Calvesco was then paid to either Moretto or Gateman individually at any point.

By mid-January, to make matters worse, the cash infusion into Calvesco had slowed dramatically. Since December 2, the tail end of the five-week period that had brought in $2.1 million from the Home Depot project, only $755,187 came in from the project as it wrapped up in December and January. Wal–Mart project payments slowed from a high of $578,700 in November to none in December, $105,730 in January, and $81,000 in February.

The 88 Broad Street office staff, meanwhile, was making a bona fide administrative effort to get the vendor payment problem under control. In addition to Hill's calling the vendors to verify accounts, Christine, on January 20, 1995, sent a letter on Calvesco letterhead to "All Vendors," informing them of "our policy for all incoming invoices." In the letter, she announced that "[b]oth Calvesco and Charles A. Jackson will pay invoices on a Net 30 day schedule. For example, all invoices dated December 1–31st will be paid Feb. 1." The letter was sent to all vendors of both companies working on all three major projects: the Post Office, Home Depot and Wal–Mart. The letter was an attempt to establish a uniform purchase order system and a policy for payment rather than attempting to adhere to varying vendors' terms.

At the time of Christine's letter, the key personnel at Calvesco and Jackson thought they could recover. Christine believed that the companies would be able to pay its bills in accordance with the new policy. Shortly after the letter was written, DeFeo reinforced this belief by telling Christine that he

was going to bring in more checks from the projects. Hill also believed that the companies would "eventually" be able to pay the vendors because "Tony DeFeo was going to get some [money], he was picking up some checks" totaling in excess of one million dollars. Moretto, for his part, had stopped trusting DeFeo but nevertheless believed that nearly half a million dollars was owed by Hyman to Jackson in payments for extras. During January 1995, reflecting this misguided sense of optimism, Calvesco and Jackson actually expanded their offices at 88 Broad Street, taking over "a large part of the remainder of the floor and ... renovating, adding office space."

Even after the large transfer on January 17, Calvesco continued to put money into Jackson, to which it lent $75,000 on January 26 and $26,000 on February 7 to meet payroll and pay bills. Those two dates coincide with Torrey payments to Calvesco: $200,004 for Home Depot on January 26, and $81,000 for Wal–Mart on February 7. But the companies simply did not have enough cash on hand by late January to pay their debts. On or about January 24, Calvesco began to bounce checks with increasing frequency. Though Calvesco had bounced checks from time to time throughout its existence, all such bounced checks prior to January 24, 1995 were not bounced fraudulently but rather due to negligence or inadvertence, typically due to delays in deposits being credited to the Calvesco account. Up until January 24, all checks bounced by Calvesco were paid.

Much the same can be said of checks drawn on the account of Jackson. On several occasions between its engagement on the Post Office Project and November 1994, Jackson had bounced checks due to timing problems with deposits into the account, i.e. when checks were issued as deposits were made into the account, but before the deposits cleared. All bounced checks were in fact paid. No checks were bounced in December 1994, and one check, also later paid, was bounced on January 24, 1995. Only after January did Jackson bounce checks with frequency and not later pay them. Before this began to occur, Moretto received two $3,000

"consulting" fees from Jackson in late January. Gateman did not receive similar fees.

Despite the mounting troubles back at the office, by all accounts Jackson's people on the Post Office site were performing their work adequately and to Hyman's satisfaction. Zeytoonjian, returning to the Post Office site in mid-January, did not notice that anything had changed there: "We were working along, just doing our work." He completed the preparation of Requisition 4 in late January. He had actually signed the cover form with its certificate in blank at the hospital, but he verified the continuation sheet attached to Requisition 4 before it was submitted in accordance with his understanding of the work that had been completed as of January 19, 1995. He also went over a penciled version of the continuation sheet with DeBruyn, or at a minimum discussed the completion and dollar figures therein, prior to his having the final copy prepared. This was consistent with the parties' practice of close daily contact and adjusting of contract numbers to account for unpaid work on extras.

Requisition 4 would never be paid. De-Bruyn received it not later than February 2, but considered it to be incomplete because it was not notarized or completed as the previous ones were. Though the requisition is incomplete on its face, the larger problem of screaming unpaid vendors was obvious to DeBruyn by this time and drove Hyman's decision to deny further direct payment to Jackson. DeBruyn recalls first hearing of "rumblings" from unpaid vendors in late January and early February. Zeytoonjian's recollection is much the same. More significantly, many of the vendors from whom De-Bruyn heard rumblings were vendors previously unknown to her and who were not included on any of the vendor lists that Jackson gave Hyman. The frenzy at the 88 Broad offices had now clearly extended to the job site, and the end was near.

Everyone wanted to find DeFeo by the beginning of February, but he was harder to locate than ever. He never showed up with the checks he had promised. When he did not, Hill, who had just begun to focus not only on payables but also on corporate funds,

became worried about both Calvesco's and Jackson's ability to pay vendors. DeFeo was around "very, very infrequently" in February, and the job was being run exclusively onsite by Zeytoonjian. On February 2, having seen but not approved Requisition 4, DeBruyn requested a complete list of Jackson vendors from Zeytoonjian after repeated unsuccessful attempts to find DeFeo. Unlike on previous requisitions, she demanded back-up documentation in the form of invoices because of the confusion over who was owed how much for what job. Zeytoonjian had no back-up documentation in the Jackson trailer on the Post Office site, but he prepared a list of vendors.

DeBruyn told Zeytoonjian that Jackson was not going to be paid until the vendors got paid. She indicated to Zeytoonjian a willingness to issue joint checks, but they were not going to be issued until she received adequate documentation of vendor work. DeBruyn and Frei checked out many or all of the vendors on the list Jackson had provided, and several of them did in fact have pay problems. Based on their research, DeBruyn compiled a list of "C.A. Jackson Open Payables" to more than fourteen vendors totaling a minimum of $178,661.61.

One week later on February 9, Christine, at the direction of her father, deposited a Torrey check written to Calvesco for, most likely, the Home Depot job, into a new and separate Jackson "payroll account." She endorsed it over to Jackson because "Jackson needed money." Immediately after the Torrey check was deposited, Moretto wired $20,000 on February 13, 1995 directly from the Jackson Payroll account to Florida for the Joseph's Restaurant investment. The wire transfer was made as a "distribution" to Gateman and Moretto. The wire transfer was apparently made by the bank before it determined that the $90,000 deposit should not be credited to the Jackson Payroll account, because, while the wire transfer cleared, nineteen checks written beginning the same day did not and were returned unpaid beginning February 15.

Somehow, Gateman controlled the remainder of the $90,000 check after the bank rejected the endorsement into the Jackson pay-

roll account. Eager to leave the Calvesco and Jackson businesses, Gateman took the funds and used it "to open an account for Calvesco ... to finish the Home Depot and Wal–Mart jobs." Gateman says "that was Calvesco's money that went to Charles Jackson Company either inadvertently or on purpose that wasn't supposed to go there. And it went to Calvesco ultimately to complete the jobs that it was intended for." Gateman's "understanding" of his role in Jackson by February was that "with respect to the post office job, [he] felt [he wasn't] obligated to it. [He] didn't sign a bond and [he] didn't indemnify anyone, that whatever debts there were on the post office job were corporate debts, they weren't [his] debts ...." There is no evidence in the record to refute Gateman's statement that the diverted money went to pay debts of Calvesco on one of the Torrey jobs.

## J. *A Hole They Couldn't Dig Themselves Out Of*

Though work continued throughout February, Hyman started down the road to terminating Jackson on February 10–16, when it sent a string of five threatening letters to Jackson. Each letter complained about unpaid vendors and Jackson's, particularly De-Feo's, repeated inattention to the problem and refusal to meet with Hyman. Several points raised in the letters, some several times, are notable. Morrissey wrote that Hyman was considering taking over Jackson's payroll to keep the project going, something it actually did sometime in February. Hyman mentioned the possibility of joint checks but never once demanded backup documentation in writing. It complained that, in the process of Hyman's researching vendor payments, Southworth–Milton had forwarded an invoice to Hyman billing for twenty pieces of equipment, when a maximum of nine pieces of equipment had ever been used on the Post Office Project. In fact, Jackson had allowed heavy equipment that Calvesco used on the Wal–Mart and Home Depot sites to be stored on the Post Office site. Finally, Hyman threatened to invoke the "Subcontractor's Failure to Perform" provision of the subcontract (which, of course, Jackson had never signed).

As the letters blanketed Jackson, Hill printed out on February 15 the last aging report she produced during her brief tenure at Calvesco/Jackson. As of that day, her report indicates that the combined debt of the two companies was still holding steady at slightly more than $1.5 million, but now only 43.9% was current, 36.8% was due 31–60 days, and 19.3% was due over 60 days. In dollars, $856,119.33 of the companies' combined payables were not current, $294,370.60 of that due more than 60 days. Hill had confidence "to the best of her knowledge" that the vendor invoice verification process was complete by this point and that this report accurately reflected the accounts payable of Calvesco and Jackson as of February 15. Hill stopped working at the offices on February 17 when, suddenly, everyone there stopped talking to her.

On February 17, 1995, DeBruyn and Morrissey finally had a meeting at the 88 Broad Street offices with DeFeo, who promised then to send the general contractor a list of vendors with supporting documentation so that Hyman could finally issue joint checks to Jackson vendors. Later that day, DeBruyn received, attached to a faxed cover sheet on Calvesco letterhead, a faxed letter on Jackson letterhead asking: "Please issue the following joint checks on behalf of Calvesco." Forty-two companies, presumably Jackson vendors, were then listed along with corresponding payment amounts. Many of the amounts listed did not match with what the vendors were telling Hyman they were owed, and the list contained about 20 or 30 more vendors than DeBruyn had ever seen on any list before. The unsigned letter concludes: "The total for the above checks is $514,-906.49[.] Thank you for your cooperation." No supporting documentation was attached, and the letter gave no indication of how much of that debt was current or overdue.

As early as the next day, DeBruyn asked Zeytoonjian and other Jackson employees on the Post Office site to verify the numbers that she had been sent by DeFeo. DeBruyn wanted to ensure that the vendors were actually working for Jackson on the Post Office Project. Zeytoonjian assumed that the joint

checks would be forthcoming in lieu of the payment to Jackson on Requisition 4 which, in the normal course, would have been paid in late February. Zeytoonjian believed, and the evidence suggests, that the amount owed to Jackson to date, including extras, was enough to cover all vendor payments via joint checks.

But Hyman, which refused to pay Jackson, never issued a joint check to a single vendor. The reason given by DeBruyn and Morrissey was that there still was insufficient "backup documentation" to allow any joint checks to be issued at all. They were specifically concerned that some of the invoices might include charges for the Home Depot project. Hyman, supposedly monitoring Jackson's vendor payments throughout the subcontract because of the bond waiver, declined to pay even a single vendor out of money owed to Jackson because its personnel wanted to take the time both to obtain backup for *all* vendors and then to compare the documents to the actual work being performed. In the meantime, spurned vendors burned.

Amidst all of this deterioration, Zeytoonjian still prepared a fifth requisition on or about February 20 for the continued work still being performed by Jackson. While Zeytoonjian again had signed the cover sheet to the requisition in bed, perhaps from the hospital, he personally verified the work contained on the continuation sheet after it was completed on February 20. He remembers that he again went over a preliminary penciled version of the continuation sheet with DeBruyn on or about February 20.

On February 23, 1995, Gateman and the Morettos formally withdrew from both companies. DeFeo assumed the title of every office of both Calvesco and Jackson and became their sole director, pursuant to certificates filed with the Commonwealth. There is no evidence of a change in stock ownership, however.

DeBruyn had a final conversation with De-Feo, by phone, on February 28, 1995. De-Bruyn asked him, in substance, where the money that Hyman had paid Jackson to date had gone. DeFeo responded: "You want to know what I did with all the money you paid me? Go stand by your fax machine, I'll show

you." He hung up. DeFeo faxed Hyman a copy of the Jackson check register, attached to a cover memo on Calvesco letterhead which said, in part, that "this documentation may also answer question with reguard [sic] to funds paid to Charles A. Jackson by Hyman Construction and what those funds were used for." The letter asks DeBruyn to respond within 24 hours so "as not to interrupt [sic] support which Calvesco, Inc. provides to Charles A. Jackson in the form of vehicles, equipment, tools and funding." The fax also came with a "Summary of Account" indicating that, to date, Calvesco had loaned Jackson $733,200 and had been repaid $656,935 of that, leaving a "Balance due to Calvesco, Inc." of $76,268.

Even as late as March 1, 1995, Jackson and its sub-subcontractors were still performing on the project. Jackson had performed satisfactorily with a full complement of workers since December 16, 1994, the last day for which Jackson received a direct requisition payment. On March 1, people from Jackson were packing up all the files and records on the job site and loading them into vans. Finally, on March 2, 1995, Morrissey at Hyman informed Jackson in writing that it was terminating Jackson as of the close of business the following day. The termination letter notes that the unresolved problems in February and the "active removal from the jobsite of your equipment and files" indicated to Hyman an intention to abandon the project.

At the time of termination, Jackson was due $308,000 in retainage on the first three requisitions. The two outstanding requisitions (4 and 5) owed from Hyman to Jackson, covering the period December 17 until February 20, totaled $556,000, including retainage. Additionally, Hyman owed perhaps as much as half a million dollars in work on extras and delay payments to Jackson. Deductible from that amount is $178,000 in payroll and labor benefits that Hyman had paid on Jackson's behalf. Hyman claims to have expended nearly an additional $1.7 million, to complete the project after Jackson's termination.

Gateman received a net income from Calvesco in 1994 of between $200,000 and $250,000, including the Joseph's investment, and none in 1995. The net income received by Moretto from Calvesco in 1994 was approximately the same, although the records are confusing on this point. The only income either man received from Jackson was the $10,000 each in Joseph's investment in February 1995, plus Moretto's consulting fees. Calvesco records show that DeFeo was "paid back" $209,187.43, an amount which included independent contractor payments, expenses and distributions.

Calvesco and Jackson both ceased to operate during March 1995 and did not fully pay all the vendors on the Torrey projects either.

### K. *Lawsuits*

The litigation generated by this subcontract began shortly thereafter and has consumed substantial judicial and attorney resources in the more than three years since. The 26 unpaid vendors sued Hyman, Calvesco, Jackson, Gateman, Moretto and/or DeFeo beginning on April 10, 1995, just over one month after Hyman terminated Jackson, under the Miller Act, 40 U.S.C. § 270a *et seq.* Four days later, Hyman filed this action, which was consolidated with the Miller Act cases on October 16, 1995. Hyman moved, unopposed, for entry of default judgment against Calvesco, Jackson and DeFeo on February 27, 1996. After extensive discovery and various litigious maneuvers by the parties, the Court denied Hyman's motion for summary judgment, which sought to fix liability on Gateman and Moretto by piercing the corporate veil of Jackson as a matter of law, on March 10, 1997. Trial was initially set for the summer of 1997 but was continued by joint motion until December 1997. In the meantime, virtually all of the vendors' Miller Act cases have been settled or finally resolved through litigation. A hotly contested thirteen-day jury-waived trial was conducted from December 2 to December 23, 1997. After several rounds of post-trial briefing, closing arguments were heard on April 2, 1998.

### CONCLUSIONS OF LAW

The counts of Hyman's complaint can be placed into two groups: claims asserted against the corporations (Counts I–IV and VII) [5]; and state claims asserted against the corporations and the individuals (Counts VI and IX). [6] Charles and Christine Moretto (together, "the Morettos") press a counterclaim alleging unfair and deceptive business practices under Mass.G.L. c. 93A for commencement of a baseless lawsuit. The disposition of the corporate claims depends on a decision whether to pierce the corporate veil of Jackson, the defaulted and defunct corporation, an issue which occupied the bulk of the trial and dominates the legal analysis set out below. The state claims, which include fraud, common law indemnity, [7] and a violation of c. 93A, are considered separately, following the discussion of veil piercing.

### I. PIERCING THE CORPORATE VEIL (Counts I–IV and VII)

Individuals, like Gateman and Moretto, cannot ordinarily be held liable under Massachusetts law for a breach of contract by their corporations. *See Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 11 (1st Cir.1986) (citing Mass.G.L. c. 156, § 38). The Court, having not held "a hearing to 'establish the truth of any averment' in the complaint," assumes "that all well pleaded factual allegations are true" as against the two defaulted corporations, Calvesco and Jackson. [8] *Quirindongo Pacheco v. Rolon*

---

5. The claims asserted solely against the corporations are breach of contract (Count I), breach of implied duty of good faith and fair dealing (Count II), promissory estoppel (Count III), contractual indemnity (Count IV) and civil RICO (Count VII).

6. There is no Count VIII in the complaint.

7. With respect to the claim of common law indemnity (Count V), Hyman has failed to brief it

and I deem it waived. Hyman alleged contractual indemnity only by virtue of piercing the corporate veil.

8. On February 27, 1996, the Court signed an unopposed order, prepared by Hyman, entering "default judgment" against both corporations despite the fact that the judgment could not be "carr[ied] into effect" without a determination of the amount of damages, Fed.R.Civ.P. 55(b)(2), and without making "an express determination

*Morales,* 953 F.2d 15, 16 (1st Cir.1992) (quoting Fed.R.Civ.P. 55(b)(2)). Only if Hyman proves that the Court should pierce the corporate veil, thereby disregarding the corporate form of Jackson, can Gateman and Moretto be held liable for the corporate wrongs alleged in the three state contract counts and the civil RICO count.

## A. *The Law of Veil Piercing in Massachusetts*

Both parties agree that the corporate veil-piercing law of Massachusetts applies to the contract claims in this case.[9] A comprehensive test for whether or not a court should "look beyond the corporate liability" of an entity to "satisfy the judgment" was articulated in 1991 by the Massachusetts Appeals Court in *Evans v. Multicon Construction Corporation,* 30 Mass.App.Ct. 728, 732–33, 574 N.E.2d 395 (1991). The Appeals Court, in crafting the legal framework, drew on the seminal Supreme Judicial Court case on the corporate disregard doctrine, *My Bread Baking Company v. Cumberland Farms, Inc.,* 353 Mass. 614, 233 N.E.2d 748 (1968), and on a more recent exploration of the Massachusetts doctrine by the First Circuit in *Pepsi–Cola Metropolitan Bottling Company, Inc. v. Checkers, Inc.,* 754 F.2d 10 (1st Cir.1985).

From *My Bread,* the *Evans* Court drew the standard for disregarding a subsidiary corporation and holding a parent corporation liable. *My Bread* held that the separateness of the subsidiary should be disregarded "when (1) there is active and pervasive control of related business entities by the same controlling persons *and* there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or (2) there is 'a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.'" *Evans,* 30 Mass.App.Ct. at 732–33, 574 N.E.2d 395 (emphasis in original) (quoting *My Bread,* 353 Mass. at 619, 233 N.E.2d 748). "In such circumstances, in imposing liability upon one or more of a group of closely identified corporations, a court need not consider with nicety which of them ought to be held liable for the act of one corporation for which the plaintiff deserves payment." *My Bread,* 353 Mass. at 619, 233 N.E.2d 748 (internal quotations omitted).

*Evans,* like this case, involved both corporate and individual defendants. The Appeals Court, as a result, considered not only the two *My Bread* factors, directed toward inter-corporate piercing, but also ten elements drawn from a consideration of piercing to individuals in *Pepsi–Cola.* It developed from the two cases a uniform list of "twelve factors which should be considered in deciding whether to penetrate the corporate form":

(1) common ownership;

(2) pervasive control;

(3) confused intermingling of business activity[,] assets, or management;

(4) thin capitalization;

(5) nonobservance of corporate formalities;

(6) absence of corporate records;

(7) no payment of dividends;

(8) insolvency at the time of the litigated transaction;

---

that there is no just reason for delay" in entering judgment in a multi-party case. Fed.R.Civ.P. 54(b). Calvesco and Jackson, having "failed to plead or otherwise defend as provided by these rules," should only have had a "default" entered against them that day. Fed.R.Civ.P. 55(a). On the last day of trial, for the first time, counsel for Moretto noted this ministerial error and sought to take advantage of it by arguing that Hyman's failure to present evidence of a breach of contract and other claims precluded liability under any theory. Since the Court assumes the truth of the allegations in the complaint, *Quirindongo*

*Pacheco,* 953 F.2d at 16, Moretto's objection is of no moment. Even if the objection had any merit, "the order [of judgment] ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties," Fed.R.Civ.P. 54(b), and the Court so revises it to an order of default.

**9.** A stricter federal standard applies to civil RICO, but the disposition of the state claims obviates the need to discuss it in detail.

(9) siphoning away of corporate assets by the dominant shareholders;

(10) nonfunctioning of officers and directors;

(11) use of the corporation for transactions of the dominant shareholders; [and]

(12) use of the corporation in promoting fraud.

*Evans,* 30 Mass.App.Ct. at 733, 574 N.E.2d 395 (citing *Pepsi–Cola,* 754 F.2d at 14–16). The *Evans* test therefore applies to both corporate and individual defendants, even though some categories may seem better suited to one inquiry than the other. *See Evans,* 30 Mass.App.Ct. at 733–36, 574 N.E.2d 395; *Birbara v. Locke,* 99 F.3d 1233, 1240 (1st Cir.1996) (viewing *My Bread* as "the standard for deciding when to pierce the corporate veil under Massachusetts law," but considering its two factors not "exhaustive" but rather only "exemplary," to be considered along with the other *Pepsi–Cola* factors).

■ Because Calvesco is defaulted and defunct, Hyman can only actually gain meaningful recovery from the two remaining individual defendants, Gateman and Moretto. Hyman argues that the Court may fix liability on the two shareholders either by "single piercing" directly from Jackson to Gateman and Moretto or by "double piercing" from Jackson to Calvesco and then to the individuals. Rather than rigidly bifurcating the analysis as Hyman suggests, the Court conducts only a single consideration of the twelve factors. *See Evans,* 30 Mass.App.Ct. at 733–37, 574 N.E.2d 395; *accord Birbara,* 99 F.3d at 1237 & n. 3 ("Although corporate and individual defendants present slightly different questions, ... the analyses are sufficiently similar to warrant discussing them together, only distinguishing the two categories when necessary."). Hyman's two theories of recovery, however, are fully addressed in this reasoning. In the process of analyzing the twelve factors, the Court considers whether the companies were run in such a way as to justify an intercorporate piercing, which on its own is meaningless to Hyman because Calvesco is penniless.[10] Such consideration

of intercorporate piercing is warranted because, in gauging the appropriateness of piercing to the individuals, the Court considers not only how Gateman and Moretto used Jackson but also how they used Calvesco. *See Pepsi–Cola,* 754 F.2d at 16 (inquiring into individual defendants' relationship to *all* of their related corporations, not merely the corporation that actually contracted with the plaintiff).

■ The twelve factors serve only to frame the veil-piercing analysis. Overarching the point-by-point analysis are equitable considerations. *Evans,* 30 Mass.App.Ct. at 736, 574 N.E.2d 395. Disregard of a corporate entity should occur only in " 'rare particular situations to prevent gross inequity.' " *Id.* at 732, 574 N.E.2d 395 (quoting *My Bread,* 353 Mass. at 620, 233 N.E.2d 748); *see also Birbara,* 99 F.3d at 1239 (collecting cases); *Berger v. H.P. Hood, Inc.,* 416 Mass. 652, 657, 624 N.E.2d 947 (1993) (respecting corporate form absent "compelling reason of equity" to do otherwise); *Commonwealth v. Beneficial Fin. Co.,* 360 Mass. 188, 289, 275 N.E.2d 33 (1971) (looking through corporate veil only to "accomplish ... essential justice") (quotation omitted). "Massachusetts has been somewhat more 'strict' than other jurisdictions in respecting the separate entities of different corporations." *My Bread,* 353 Mass. at 619–20, 233 N.E.2d 748, *quoted in Birbara,* 99 F.3d at 1238. While the corporate form may be disregarded on rare occasions, it is important not to forget the basic principle that "[c]orporate distinctness is respected as a means of limiting liability and thus fostering investment in corporate enterprises." *Strom v. American Honda Motor Co.,* 423 Mass. 330, 344, 667 N.E.2d 1137 (1996); *see also Berger,* 416 Mass. at 657, 624 N.E.2d 947 ("It is only where the corporation is a sham, or is used to perpetrate deception to defeat a public policy, that it can be disregarded.") (quotation omitted).

### B. *The Piercing Factors*

■ As the First Circuit wrote just months ago, "[t]he legal standard for when it

---

**10.** An intercorporate piercing may have meaning to some of the Miller Act plaintiffs, especially

those who contracted with Calvesco rather than Jackson.

is proper to pierce the corporate veil is notably imprecise and fact-intensive." *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17, 21 (1st Cir.1998). "There is a consensus that the whole area of limited liability, and conversely of piercing the corporate veil, is among the most confusing in corporate law." *Id.* at 21–22 (quoting Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L.Rev. 89, 89 (1985)). This case is no exception. The Court's analysis begins with an examination of the twelve *Evans* factors.

### (1) *Common Ownership*

Jackson and Calvesco were commonly owned by Gateman, Moretto and DeFeo. The sole shareholders of Jackson were, in name, the daughters of Moretto and Gateman, but, by Moretto's own admission, the daughters were not owners in fact but rather straws for their fathers. DeFeo represented to Hyman that Jackson would have the "same owners" as Calvesco, and Jackson in fact was solely funded by loans from Calvesco. There were no other owners besides the three individuals, and the evidence is that there was no difference in the way Jackson was owned than the way Calvesco was owned. The two entities were not "operated on an arm's length basis as to one another." *Evans*, 30 Mass.App.Ct. at 733, 574 N.E.2d 395.

### (2) *Pervasive Control*

Both financially and operationally, Moretto, Gateman and DeFeo were pervasively the "controlling persons" of Jackson. *See id.* at 733–34, 574 N.E.2d 395; *see also My Bread*, 353 Mass. at 620, 233 N.E.2d 748 (characterizing an individual as a "dominant figure" in both companies); *Beneficial Fin. Co.*, 360 Mass. at 291, 275 N.E.2d 33. The control of Jackson did not differ in any material way from the control of Calvesco.

### (3) *Confused Intermingling*

Jackson and Calvesco were "engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities." *My Bread*, 353 Mass. at 618–19, 233 N.E.2d 748. Zeytoonjian himself considered the two corporations to be "one company." Key letters and memoranda on one project were sent out on the letterhead of the other and included the affairs of both. Heavy equipment from Calvesco projects was stored on the Jackson Post Office site. Gravel was transferred from a Calvesco job to the Jackson Post Office job without paperwork documenting any kind of sale from the one to the other. All of Hill's accounts payable ledgers were combined reports for both companies. Vendors were confused about which company they were dealing with. Gateman himself described the monies from the sale of the scrap metal on the post office site as "Calvesco funds." Even more telling is the fact that at least two key "employees" of Jackson were never paid by Jackson: Linda Hill and Christine Moretto. Zeytoonjian was paid as much by Calvesco for his work on the Post Office Project as he was by Jackson. *See Evans*, 30 Mass.App.Ct. at 734, 574 N.E.2d 395 (placing substantial weight on whether a . corporation pays its employees and only its employees). Though the use of funds from one corporation or the other was far short of "random," *Pepsi–Cola*, 754 F.2d at 15, debts of one company were in fact paid on occasion by the other.

From the point of view of an intercorporate piercing, there was between Calvesco and Jackson a "confused intermingling of business activity, assets, or management." *Evans*, 30 Mass.App.Ct. at 734, 574 N.E.2d 395. In reality, Jackson was effectively a non-union front used for another Calvesco contract. Though technically Jackson's business consisted solely of the Post Office Project and all other projects belonged to Calvesco, in reality the separation between the two businesses was not "clearly defined." *Id.* The defendant corporations together "were operated as a closely coordinated single enterprise." *My Bread*, 353 Mass. at 620, 233 N.E.2d 748; *see also Beneficial Fin. Co.*, 360 Mass. at 291, 275 N.E.2d 33 (piercing from subsidiary to parent in part because subsidiary was operated as nothing more than a "division" or "adjunct" of the parent).

This factor weighs in favor of an intercorporate piercing, but not heavily. The salient fact is that Hyman was not confused at all

about the intercorporate relationship. Hyman agreed to the switch from Calvesco to Jackson so long as it was a change in name only: Morrissey said "it doesn't matter to me what they call themselves" so long as the same people were involved and the work continued. Hyman's agents had complete knowledge of Calvesco's other projects and in fact were attracted to Calvesco because of its stash of gravel at Home Depot. *Compare My Bread,* 353 Mass. at 621, 233 N.E.2d 748 (finding that evidence supported intercorporate piercing because plaintiff corporation reasonably assumed he was dealing with both the parent and the subsidiary rather than one in lieu of the other) *with Birbara,* 99 F.3d at 1239 (denying intercorporate piercing where there was no evidence that plaintiffs were misled or confused about the intercorporate relationship.) Though Jackson's and Calvesco's affairs were confusingly intermingled, the evidence shows that Hyman either expected that they would be or did not care, at least until the Project broke down.

The application of this factor to individual piercing poses a slightly different question. Hyman points to several pieces of evidence relative to the intermingling of Jackson and Calvesco assets with those of Gateman and Moretto to support tipping this factor in its favor. As to Jackson, Hyman identifies two transactions: (1) the transfer of $20,000 directly from Jackson's payroll account as a profit distribution to fund their personal investment in a Boca Raton restaurant although the individuals had made no loans or investments in Jackson; and (2) the direct payment of cash from the sale of scrap metal from the post office project in October through December 1994, the proceeds of which should probably have gone to Jackson or at least to Calvesco.

These two transactions, while suspect, fail to carry the weight with which Hyman seeks to saddle them. The $20,000 payment to Joseph's at the height of Jackson's fiscal woes appears problematic only until the sequence of events is scrutinized. On February 9, 1995, Calvesco attempted to loan Jackson $70,000 by signing over a $90,000 Torrey check payable to Calvesco into a Jackson account to pay its vendors and by wiring $20,000 of it to the Joseph's account. When the endorsement was ultimately rejected, only the $20,000 had cleared. This chronology, while supporting an intercorporate piercing, negates the inference that this was an intermingling of personal and corporate assets. The scrap iron transaction does support an intermingling of personal and corporate assets of Jackson, but standing alone it is too thin a reed to shift this factor in Hyman's favor.

With respect to Calvesco, Hyman points out that Gateman used some small amount of personal funds (in an amount difficult to calculate) to pay obligations of Calvesco relating to the Home Depot project. While this evidence does suggest that there was some disregard of the corporate form on these limited occasions, the record as a whole does not demonstrate a substantial disregard of the separate nature of the corporate entity by the individuals. On balance, this factor weighs in favor of an intercorporate piercing but against piercing to the individuals.

### (4) *Thin Capitalization*

The legal touchstone for adequacy of capital in a veil-piercing case is directed at whether a corporate entity was or was not set up for financial failure. Since insolvency is dealt with separately under the *Evans* test, the focus of capitalization inquiry is on the adequacy of *initial* funding. *See Evans,* 30 Mass.App.Ct. at 734, 574 N.E.2d 395 (finding that owners provided the corporation "with the up-front financing needed" to perform its work); *Birbara,* 99 F.3d at 1241 (noting that a corporation sufficiently initially capitalized should not be disregarded simply because it "subsequently fell on hard times" or became insolvent "after a change in the tax laws"). The "pertinent question" is whether capital was "too thin" to do the job at hand. *Evans,* 30 Mass.App.Ct. at 734, 574 N.E.2d 395; *cf. My Bread,* 353 Mass. at 621, 233 N.E.2d 748. The parties devoted days of expert testimony and thick documentary submissions to the setting of a dollar figure representing adequate capital.

In one respect, the debate over the dollar figure skips past the relatively simple conclusion that Jackson itself was not "capitalized"

as an entity independently capable of performing the Post Office Project. It was initially financed with a loan of only $20,000 for a company performing a $2.8 million project, and Jackson thereafter depended entirely for working capital on spoon-fed loans from Calvesco. Though Jackson's account was replenished with similar small deposits by Calvesco on nearly a weekly basis, at least through 1994, it was loaned funds by Calvesco in increments sufficient only to keep its head above water. It was not initially capitalized as a separate, independent site and demolition contracting company undertaking a major project. *See Giuliano v. Nations Title, Inc.,* 938 F.Supp. 78, 82 (D.Mass.1996) (referring to a subsidiary that is "not a self-contained business operation" as "undercapitalized"), *aff'd,* 134 F.3d 361, 1998 WL 45459 (1st Cir.1998). In fact, the defendants' own expert relied explicitly on the resources of Calvesco and its owners in forming his opinion that Jackson was adequately capitalized. Jackson's financial success was entirely dependent on continued largess from Calvesco. When the largess ceased, so did Jackson.

Calvesco was different. It was initially funded in late May and early June 1994 by $28,333 in loans from Gateman and Moretto. The Woburn Bindery project was worth only $7,000 and MIT only $75,000, and this initial capitalization was not "too thin" to get the company off the ground with those relatively tiny undertakings. *See Evans,* 30 Mass.App. Ct. at 734, 574 N.E.2d 395 (holding that while capital ($500) was "unquestionably thin," it was not "too thin" where the needs of the company did not demand more); *Hanson v. Bradley,* 298 Mass. 371, 380, 10 N.E.2d 259 (1937) (in determining whether to respect the corporate form, one factor is whether the capital is "illusory or trifling compared with the business to be done"). Here, Calvesco's initial capitalization was thin but not anorexic. Gateman and Moretto loaned more money to the company in July 1994 when the Home Depot project began. Calvesco's initial capitalization is not indicative of a company set up for financial failure.

The facts bear out the conclusion that Calvesco was sufficiently capitalized by the individuals at the outset such that the company could generate wealth independently. It was in fact overwhelmingly successful over its first six months in operation. Even if the capitalization inquiry were to focus on September 1994, when the Post Office Project began, the individuals' contributions earlier in the summer had launched the company, and Calvesco was capitalized for the Post Office undertaking. Even Thomas M. Blake, plaintiff's expert, conceded Calvesco had adequate capitalization in the October time frame. At that point, the beginning of the glory months, Calvesco had large sums in the bank and consistent payments from several sources. Given those payments, the fact that Moretto's and Gateman's initial investments had been recouped has no factual bearing on whether or not the company was adequately capitalized. *Cf. Birbara,* 99 F.3d at 1241 (distinguishing undercapitalization from sufficient capitalization depending on particular facts of the business).

#### (5) *Nonobservance of Corporate Formalities*

Jackson's observance of corporate formalities was incomplete. It did not operate long enough to complete some of the more noticeable ones, such as filing tax returns and certificates of condition with the Secretary of the Commonwealth. *See Evans,* 30 Mass. App.Ct. at 734, 574 N.E.2d 395. It did, however, fill out articles of organization and two certificates of change of officers. Jackson had bank accounts and a "check register" separate from Calvesco's. It also had separate payroll accounts with ADP.

The relative lack of formalities at nascent Jackson, however, overstates the case for piercing to the individual defendants because Calvesco's corporate formalities were, by and large, observed. It also filed an articles of organization, certificates of change of principal office and of officers and an annual report. Calvesco duly filed a statement of condition. There is no evidence that it filed tax returns or paid taxes on a quarterly basis as the IRS guidelines prefer, but do not require. Calvesco funds may have paid for employee services performed for Jackson, but there is no evidence that corporate funds were used to pay employees for services not

related to the site and demolition business. *Cf. id.* at 734, 574 N.E.2d 395. Gateman's and Moretto's principal failing in this regard was the characterization of the individuals' investments in the enterprise as "loans" without any promissory notes or minutes documenting a recognized interest rate or loan term to back them up. This fact only has limited weight because the corporation diligently recorded the loans and paybacks on its registers. Though Calvesco and Jackson were not run smoothly, they were run as a corporate enterprise out of their offices, with most or all of the trappings required to maintain the corporate fiction.

### (6) *Absence of Corporate Records*

Defendants concede that the records of both Jackson and Calvesco were no model of corporate governance. For example, there were no corporate minutes. But records did, at a minimum, exist, and the check registers, the profit and loss statements and Hill's ledgers indicate at least some good faith effort to maintain accurate records. *Cf. Pepsi–Cola,* 754 F.2d at 16 (finding individual defendant "kept no records"). Furthermore, though its progress was haphazard, Jackson's bookkeeping did actually improve as time went on. Hyman's principal argument in this regard was that Jackson, without a job-costing system, had no way to know how it was doing financially and therefore effectively had no records. The legal question, however, is not whether Jackson's records were adequate but whether, for purposes of corporate legitimacy, they actually existed.

### (7) *No Payment of Dividends or Distribution of Profits*

■ In the process of examining a corporation, this element is designed as a "telltale that it was a dummy corporation whose veil ought to [be] pierced." *Evans,* 30 Mass.App. Ct. at 735, 574 N.E.2d 395. In other words, corporations in the normal course should be paying dividends, or at a minimum making conscious decisions not to do so. Here again, when asking whether Gateman and Moretto should be held accountable for Jackson's debts, the way they treated *both* related companies is critical. *See Pepsi–Cola,* 754 F.2d

at 16. Jackson paid no dividends or distribution of profits to its actual shareholders, Moretto's daughter and Gateman's daughter, or to its de facto shareholders, Moretto, Gateman and DeFeo. *See Evans,* 30 Mass. App.Ct. at 734, 574 N.E.2d 395. The only forms of "gain" for the real owners was the direct investment on their behalf in Joseph's Restaurant in Florida in February 1995 (at a time when Jackson could not meet payroll) and profit from the sale of scrap metal taken from the Post Office site. However, as in *Evans,* a business can have a legitimate purpose even if it is not designed to make dividend payments or profit distributions. Here, the business purpose, endorsed by Hyman, was to have a union front for the subcontractor. *Id.* at 735, 574 N.E.2d 395.

The individuals did draw hefty profit "distributions" from Calvesco, which was always their intention. Gateman's and Moretto's individual loans or investments were recouped by September 1994, and all payments to the individuals after that, both in cash and in the form of direct investment in Joseph's, were in essence profit distributions. Calvesco and Jackson, viewed as separately or as a common enterprise, were operated, at least through the end of 1994, as legitimate, profit-seeking corporations.

### (8) *Insolvency at the Time of the Litigated Transaction*

■ A test of insolvency, as opposed to capital adequacy, is when a corporation "experienced difficulty in paying debts as they became due." *Id.* at 735, 574 N.E.2d 395; *see also Birbara,* 99 F.3d at 1241 (defining insolvency as "unable to pay its debts as they fell due"); *cf. Barrett v. Continental Ill. Nat'l Bank & Trust Co.,* 882 F.2d 1, 4–5 (1st Cir.1989) (in context of fraudulent conveyance law, looking prospectively to determine whether a transfer left corporation with so little capital that "the business'[s] ability to continue operations" was affected). The "time" considered for the test of insolvency is not a single point in time but rather the duration of the contested transactions between the parties. *See Evans,* 30 Mass.App. Ct. at 735, 574 N.E.2d 395 (referring to the

"years in question" in deciding whether corporation was insolvent).

Jackson flunks the insolvency test, no matter how phrased. From the beginning of 1995 forward, it was unable to pay its debts as they came due. By March 2, 1995, when the Hyman–Jackson relationship was severed, Calvesco was insolvent as well. However, it appears to have been solvent during most of the litigated relationship with Hyman into some time in February, 1995.

### (9) Siphoning Away Corporate Assets

■■■■ A circumstance strongly suggesting veil piercing is a case of "financial misconduct of the subsidiary involving such manipulation as asset-stripping or asset-siphoning, which depletes the resources of the subsidiary." *Birbara*, 99 F.3d at 1241 (quotations omitted) Hyman is responsible for presenting "credible evidence of subterfuge or channeling excessive payments." *Id.* at 1241 n. 8. Hyman focuses on the transfer of $129,600 from Jackson to Calvesco on January 23, the day of the payment on Requisition 3 by Hyman. The transfer came at a time when Gateman and Moretto knew that vendors on both Calvesco and Jackson projects were sixty days overdue to the tune of several hundred thousand dollars. Jackson's checking account was significantly depleted by the payment to Calvesco. *Cf. Crane*, 134 F.3d at 23 (noting that "wrongful diversion" of assets at a time of "financial distress" has been a consistent reason for piercing). This evidence suggesting a prioritization of Calvesco vendors somewhat supports intercorporate piercing between Jackson and Calvesco.[11]

But two other facts preclude the conclusion that the January transfer was intercorporate asset siphoning. First, Calvesco loaned Jackson $101,000, nearly the full amount of the January 23 transfer, in two installments within three weeks after the transfer, and $58,000 the week before the transfer. Second, the transfer was made at a time when

there was a legitimate expectation of more substantial payments from Hyman, both on the contract and for extras in the coming months. Evidence that Gateman was withdrawing from the businesses at the time and was wrapping up the Torrey jobs before his departure may explain why Calvesco was prioritizing the Torrey vendors over the Hyman vendors. This failure to pay Hyman funds to Post Office Project vendors may well constitute a breach of contract between Hyman and Jackson, but it lacks the willful depletion of corporate assets necessary for a determination of asset siphoning.

■■■■ More importantly, the Court concludes that the January transfer to Calvesco does not qualify as a siphoning of assets by the individuals sufficient to support impaling them. There is no evidence that any of the $129,600 went into the pockets of Gateman or Moretto because there were no distributions to the individuals from Calvesco after December 1995. The only individual benefits received by them after the transfer were $6,000 in "consulting fees" for Moretto (who was working on a daily basis in the office) and $10,000 each in February, the final investment by Calvesco and Jackson in Joseph's. Siphoning of assets should not be confused with "drawing salaries and receiving certain benefits." *Birbara*, 99 F.3d at 1241. The Joseph's payments constitute a stripping, but without effect. Moretto and Gateman had no legal right to take a distribution from Jackson because there were no profits, or a loan payback because they had made no loans to Jackson. However, the nefariousness of this improper $20,000 transfer was mitigated by the fact that the $20,000 was intended to come from Calvesco funds (i.e., the $90,000 check from Torrey). Also, in light of the small amount of stripped money, there is no meaningful nexus between the intent to strip and the primary injury to the plaintiff: nonpayment of vendors resulting in a shutdown of the project.

---

11. Hyman also argues that after the November requisition on November 10, 1994, Jackson was a net lender to Calvesco and should be faulted for not paying its vendors at that time. However, it relies on an accounts payable aging report which does not show that Jackson (as opposed to Calvesco) had numerous unpaid vendors with invoices dating back to November or earlier. There is no persuasive evidence that as of November 10, when Jackson made a loan payback, it had substantial overdue vendor bills.

Hyman also emphasizes the "exorbitant returns" of 248 to 260 percent which the dominant shareholders made by pulling money out of Calvesco and, in Hyman's words, leaving the vendors stuck high-and-dry after "looting" the corporation. The problem with this argument is that Gateman and Moretto pulled out these substantial sums in the boom days of November when they believed that Calvesco was fiscally in the black. There was no intent to render either Calvesco or Jackson judgment proof. Hyman has failed to demonstrate that the noncurrent payables at this time were substantial or could not reasonably be expected to be covered by the receivables. To be sure, they had dragged their feet in implementing a job-costing system, and all the experts agreed that without such a system it was risky to take money out of a construction business. Defendant's expert Newburg agreed that the withdrawals turned out to be detrimental to the ultimate financial viability of Calvesco. While Calvesco is fairly faulted for not continuing to loan sufficient money to Jackson to pay the vendors in January and February as was implicit in its promises to Hyman, nonetheless the Court finds the individuals took the earlier distributions in the good faith belief the corporation could continue to fund the vendors from the receivables. Similarly, the receipt of the money for scrap metal was at a time when the outlook was rosy. In these circumstances, the Court does not conclude that the November distributions constitute a "subterfuge or a channeling of excessive payments" in light of the tremendous profit expected on the Home Depot job.

### (10) *Nonfunctioning of Officers and Directors*

Moretto, Gateman and Christine Moretto were the named officers and directors of Jackson. The Morettos actively functioned in their capacities (despite their admitted lack of knowledge about the precise legal duties of their positions). Gateman, the Clerk and a director, had a less active role, but his involvement in the affairs of Jackson was sufficient to demonstrate that all the officers and directors of Jackson were functioning.

### (11) *Use of the Corporation for Transactions of the Dominant Shareholders*

Several acts by the individuals cause this element to lean slightly in favor of piercing. First, the scrap metal sales affect this factor too. Gateman and Moretto claim that the scrap metal was not addressed by the bid and therefore not property of Jackson's, but it is hard to imagine how the scrap could become the personal property of Gateman and Moretto. Second, the investments in Joseph's Restaurant in November and February were personal in nature. Lessening the impact of these transfers is the fact that they were recorded in the books as distributions on behalf of the individuals, and the law is clear that distributions or dividends do not necessarily have to be in the form of cash. *See Evans,* 30 Mass.App.Ct. at 735, 574 N.E.2d 395. Less susceptible to excuse is the excessive money expended on DeFeo's Ferrari and Moretto's Mercedes, neither of which show up as distributions and which seem extravagant beyond any reasonable business usage. *See Pepsi–Cola,* 754 F.2d at 16.

### (12) *Use of the Corporation in Promoting Fraud*

The promotion of fraud in this context may be found if a corporation "was established *or operated* so as to misrepresent or divert assets." *Evans,* 30 Mass.App.Ct. at 736, 574 N.E.2d 395 (emphasis added). This demonstration of "fraud" is something less than a showing of fraudulent intent, which is not required for piercing under Massachusetts law. *See Schaefer v. Cybergraphic Sys., Inc.,* 886 F.Supp. 921, 925 (D.Mass. 1994) (comparing Massachusetts to the federal standard, which includes a requirement of fraudulent intent) (citing *My Bread,* 353 Mass. at 619, 233 N.E.2d 748). There is no evidence that Gateman or Moretto *established* Calvesco or Jackson to perpetrate a fraud, something Hyman alleged in its complaint but did not press vigorously at trial. In fact, all evidence supports the conclusion that the Post Office Project, through Jackson, could be a continuation of the high return expected from the two Torrey projects.

Nor was Jackson or Calvesco *operated* by Gateman and Moretto as a fraudulent enterprise. Hyman's argument that the non-payment of vendors and the $129,600 transfer constitutes fraud is unconvincing for the same reasons the Court did not consider the transfer an asset-siphoning. Furthermore, the operation of the companies by the individuals falls short of demonstrating the kind of inherent sham suggested by the cases. Jackson "did not masquerade as something it was not," and neither did Calvesco. *Evans,* 30 Mass.App.Ct. at 736, 574 N.E.2d 395. Gateman and Moretto operated a site and demolition business made up of a union corporation and a non-union corporation. All of Jackson's functions were "fully staffed" until the Project fell apart. *Id.* There was no misrepresentation about who was running the show. *Id.* ("Names of officers were revealed"). The fact that something went wrong with this deal, and even the fact that Gateman and Moretto may have caused it, does not mean that Jackson was a fraudulent enterprise for the purposes of the law of corporate veil piercing.

### C. *Weighing the Factors and Considering Equity*

This is a difficult and close case—complicated by poor business judgment on both sides. It is important, in deciding this issue, which is critical in terms of whether or not Hyman receives a remedy, not to lose sight of what the legal question is and is not. This decision is *not* dependent on whether or not Jackson breached its subcontract with Hyman. The issue here is whether this is one of those rare, particular situations in which the corporate form, by its inception a vehicle of limited liability, should be set aside. "Because piercing 'is the exception, not the rule,' ... plaintiffs 'must meet a very high standard' before they will be allowed to disregard a corporate form." *Commonwealth Aluminum Corp. v. Baldwin Corp.,* 980 F.Supp. 598, 605 (D.Mass.1997) (quoting *American Home Assurance Co. v. Sport Maska, Inc.,* 808 F.Supp. 67, 73 (D.Mass. 1992)).

### (1) *Tallying the Evans Factors*

Half of the factors favor an intercorporate piercing between Jackson and Calvesco: (1) common ownership; (2) pervasive control; (3) confused intermingling of corporate assets; (4) nonexistent initial capitalization of Jackson, in contrast to Calvesco; (5) nonpayment of dividends or distributions by Jackson as opposed to Calvesco; (6) insolvency of Jackson in terms of aged payables by January 1995. Two other factors, incomplete corporate formalities and use of the corporation for transactions of the dominant shareholders, are effectively neutral on the issue of intercorporate piercing. The remaining four factors cut against intercorporate piercing: (1) the existence of separate corporate records; (2) functioning directors and officers; (3) an absence of fraud in the establishment or operation of the corporations; and (4) no intercorporate siphoning of assets with the business strategy to render Jackson insolvent or judgment proof.

In contrast, only four *Evans* factors support piercing to the individuals: (1) common ownership; (2) pervasive control; (3) insolvency; and (4) to a limited extent, the use of the corporation for transactions of the dominant shareholders. The rest of the factors paint a murkier scene. There was confused intermingling of personal assets with corporate assets of Jackson and Calvesco only in three respects: the scrap iron, the $20,000 Joseph's transfer, and the payment by Gateman of Calvesco debts from his personal account. Otherwise, there was substantial regard for the separateness of Jackson/Calvesco from the individuals. Calvesco was adequately capitalized, observed most corporate formalities, and paid distributions of profits which were substantial but not out of whack with the profitability of the Home Depot job. It only became insolvent late in the relationship with Hyman, and was not operated to perpetuate a fraud. While the Mercedes/Ferrari expenditures for Moretto and DeFeo (not Gateman, who disapproved them) support a piercing, they were the only exorbitant benefits for the dominant shareholders. There is no minimum requirement for the number of factors required to find personal liability, but the Court is unaware of

any case that has pierced through to individuals with so few factors. *See, e.g., Evans,* 30 Mass.App.Ct. at 736, 574 N.E.2d 395 (not piercing on the weight of only four factors).

### (2) *Weighing the Factors*

■ The factors are weighed, not counted. Counting alone is insufficient to pierce because instead "[o]ne examines the twelve factors to form an opinion whether the overall structure and operation misleads. There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing." *Id.* at 736, 574 N.E.2d 395; *see also Birbara,* 99 F.3d at 1240 & n. 6.

Though undeniably the late stages of the Hyman–Jackson relationship were "confusing," that confusion did not originate from a misuse of the corporate form of Jackson with the purpose of misleading Hyman, which expressly approved the use of a different company owned by the same individuals to avert the union problem. Hyman knew about, endorsed and encouraged the change of companies and knew and *required* common ownership and pervasive control by Gateman and Moretto. This fact severely diminishes the appropriateness of intercorporate piercing on Hyman's behalf. *Compare Birbara,* 99 F.3d at 1240 (weighing against piercing the fact that plaintiffs "were never misled" about the defendant corporations' relationship with one another) *with My Bread,* 353 Mass. at 621, 233 N.E.2d 748 (relying for corporate disregard on the unexplained ambiguity of operation between parent and subsidiary). Hyman became confused by January about what was happening with its site and demolition subcontract, but the responsibility for that confusion rests in part with its own failure to supervise the status of the vendors, and, in part, with the ineptitude of the defendants. To pin the confusion on an abuse of the corporate form or on a concerted effort by Gateman and Moretto to manipulate, contrive or finagle distorts the truth of what really happened on this job.

The two *My Bread* factors are reflected in the overarching emphasis on confusion and misuse of the corporate form by the *Evans* Court. The *My Bread* factors do not support an intercorporate piercing on Hyman's behalf because of Hyman's knowledge of, or indifference to, the corporate relationship between Calvesco and Jackson. First, there was "no fraudulent or injurious consequence *by reason of the relationship*" between Jackson and Calvesco. *Evans,* 30 Mass.App.Ct. at 732, 574 N.E.2d 395 (citing *My Bread,* 353 Mass. at 619, 233 N.E.2d 748) (emphasis added). Second, Hyman cannot satisfy the other, disjunctive *My Bread* prong because of its lack of confusion. *See* 353 Mass. at 619, 233 N.E.2d 748.

■ The weighing of the factors relative to the individuals even more strongly counsels against the veil piercing that really matters to Hyman. Though it is difficult to quantify a different level of proof, "courts have evinced a 'greater willingness to reach the assets of corporate as opposed to personal shareholders.'" *Birbara,* 99 F.3d at 1237 n. 3 (quoting Easterbrook & Fischel, *The Economic Structure of Corporate Law,* 56 & n. 9 (1991)). While Moretto and Gateman used the corporate form's limited liability to their advantage, the evidence does not prove that "the principal shareholders of a close corporation fail[ed] to observe with care the corporation's existence . . . ." *Pepsi–Cola,* 754 F.2d at 16. "[T]here is nothing fraudulent or against public policy in limiting one's liability by the appropriate use of corporate insulation." *American Home Assurance,* 808 F.Supp. at 73 (quoting *Miller v. Honda Motor Co.,* 779 F.2d 769, 772 (1st Cir.1985)).

What emerges from the evidence is a picture that does not support looking to the individuals for corporate liabilities. Jackson's portion of the Post Office Project unraveled for a number of reasons. DeFeo, the key manager on the Project and an officer of Calvesco and Jackson, was overwhelmed by his substance abuse and disappeared at a time when the company could ill afford his departure. Calvesco and Jackson were in over their heads at this point; after four or five unusually successful months working on other projects, they had no idea how to re-

cover from adversity and it quickly became apparent that the enterprise was doomed. Hyman, in the meantime, had severe organizational problems of its own, as DeBruyn and Morrissey lost control of the Post Office Project and were unable to recognize and act on warning signs of an underqualified subcontractor.

When push came to shove, Calvesco's and Jackson's owners, with suddenly less money to deal with than they had expected, preferred vendors on the Torrey projects, for which they had provided personal bonds, over vendors on the Hyman project, on which Hyman had knowingly allowed Calvesco–Jackson to escape without one. Hyman urges the Court to "follow the money." The loan paybacks are, as Hyman acknowledges, the "heartland" of its case against defendants. With legitimate expectations of more money from Hyman, the intercorporate transfer of $129,000 to Calvesco in January after the payment of the third requisition might constitute a breach of contract, but it falls short of supporting a disregard of the corporate form which would justify looking beyond the corporation(s) to Gateman and Moretto.

### (3) *Equity*

 Beyond the lack of evidence to satisfy the Massachusetts tests, this case also falls short of the meeting the maxim that disregard of the separate corporate identity is reserved for "rare particular situations in order to prevent gross inequity." *My Bread*, 353 Mass. at 620, 233 N.E.2d 748. Three aspects of Hyman's own actions preclude the invocation of such an unusual equitable remedy. First, Hyman hired Calvesco with minimal investigation into the crew with which it would be dealing. *See Greenery Rehabilitation Group, Inc. v. Antaramian*, 36 Mass. App.Ct. 73, 79, 628 N.E.2d 1291 (1994) ("Also bearing on a claim of 'inequity' was the fact that the plaintiffs took no pains to investigate the corporation and were conspicuously unconcerned about it."). It knew of Calvesco's limited experience, but the extent of Hyman's investigation into the company was that it ran a Dun & Bradstreet and surveyed the Home Depot site for the existence of excess gravel. Hyman, attracted by the gravel and Calvesco's rock-bottom price and eager to get the ball rolling, so to speak, on demolition and site work, agreed to allow work to begin. The details would follow. Hyman made no inquiry whatsoever into the financial structure of the two corporations. The switch to Jackson was entirely uninvestigated.

Second, in its dealings with Calvesco–Jackson, Hyman made exception after exception to its own corporate policies designed to prevent this kind of problem. Morrissey had to affirmatively override an administrative hold on payment because of there being no signed subcontract in corporate headquarters or a bond. Hyman's decision to waive the bond requirement made Hyman's bed by absolving Moretto and Gateman of any personal contract liability so long as they respected the corporate form. Hyman finds itself now in the difficult position of asking the Court to invoke the "rare" remedy of piercing the veil by finding "gross inequity" in the fact that Jackson did not pay its vendors, something the parties agreed would be monitored closely by Hyman from November forward.

Third, Hyman did nothing to stop the bleeding and itself abandoned all of the vendors, mostly small businesses, that were not critical to the continuation of the Post Office Project. Joint checks were mentioned as early as November at the bond waiver meeting, but none were ever issued. DeBruyn and McCarthy testified that joint checks could not be issued because of inadequate backup documentation, but that explanation is simply not credible when not a single joint check was issued by Hyman to Jackson vendors. Hyman did not pay Jackson a dime for work performed after December 16, which is particularly harsh due to the hundreds of thousands dollars worth of extracontractual work Jackson actually performed on extras both before and after that date. Nevertheless, Jackson kept working on the Project through March 1, more than ten weeks after the last day for which it was paid and six weeks after its last payment. While it is understandable that Hyman refused to pay Jackson in mid-February on Requisition 4, its actions demonstrated absolutely no intent

to pay the only truly innocent parties, the vendors who were not compensated for goods and services provided.

The Court concludes that Hyman has not proven by a preponderance of the evidence that Moretto and Gateman should be held individually liable for the corporate debts of Calvesco and Jackson by virtue of piercing the corporate veil. While the case for an intercorporate piercing (alone, meaningless to Hyman) is far stronger, the facts do not support piercing to benefit Hyman which, unlike many of the Miller Act plaintiffs, was not confused and was involved in the events that led to the corporate changeover. As a result, Hyman cannot prevail against Gateman or Moretto on any of the contract or promissory estoppel claims. Additionally, Hyman cannot pierce the veil on the RICO claim asserted against the corporations because they certainly cannot meet the stricter federal veil-piercing standard. *See Schaefer*, 886 F.Supp. at 925 (citing *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1093–94 (1st Cir.1992)).

## II. *STATE CLAIMS AGAINST INDIVIDUALS (Counts VI & IX)*

For reasons similar to those stated in the veil piercing discussion, Hyman cannot prevail on any of the state claims which may be construed directly against Moretto and Gateman.

### A. *Fraud (Count VI)*

■ An individual officer of a corporation "is liable for torts in which he personally participated, whether or not he was acting within the scope of his authority." *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir.1980); *see also Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 11 (1st Cir.1986) (same); *LaClair v. Silberline Mfg. Co.*, 379 Mass. 21, 29, 393 N.E.2d 867 (1979) (same); *Cash Energy, Inc. v. Weiner*, 768

F.Supp. 892, 895 (D.Mass.1991) (allowing corporate officers to be held personally liable for the torts of a corporation when there is "active personal involvement in a tortious act"). Hyman alleges that the individual or corporate defendants misrepresented:

(i) the nature, name and structure of their common enterprise, which entered into various agreements with Hyman;

(ii) their intentions to perform their obligations under the Agreement;

(iii) that all Vendors would be paid before requisitions for payment were submitted to Hyman;

(iv) that all amounts due and owing to Vendors had been timely paid;

(v) that checks written to Vendors were adequately funded; and

(vi) defendants' actual use of equipment and other reimbursable expenditures on the Post Office Project.

(Second Amended Compl. ¶ 82.) Only the third, fourth and fifth misrepresentations alleged in the complaint were pressed in post-trial briefing. The other three, which in any event are unsupported by the evidence, are considered waived.[12]

■ "A claim for misrepresentation requires that a plaintiff show a false statement of material fact made to induce the plaintiff to act and reliance on the false statement by the plaintiff to his detriment." *McEneaney v. Chestnut Hill Realty Corp.*, 38 Mass.App. Ct. 573; 575, 650 N.E.2d 93 (1995). Hyman must prove that Moretto or Gateman knew that the statement was false at the time it was made. *See Metropolitan Life Ins. Co. v. Ditmore*, 729 F.2d 1, 4 (1st Cir.1984) (citing *Barrett Assocs., Inc. v. Aronson*, 346 Mass. 150, 152, 190 N.E.2d 867 (1963)).

■ The third and fourth alleged misrepresentations are effectively the same because they center on the "Certificate of the

---

12. Hyman attempts to allege a new "fraud" in its post-trial briefing, viz. "establishing and maintaining Jackson in such a way as to funnel great sums of money to themselves directly and through Calvesco, while leaving the corporation unable to perform its contract and pay any of its creditors, as discussed above [in the section on piercing the corporate veil]." (Pl. Proposed Concl. of Law at 44.) Because this "misrepresentation" was not alleged in the complaint and because it does not on its face make out a claim of fraud, the Court does not consider it. At best, Hyman is restating here its argument for piercing the corporate veil rather than establishing a claim containing the elements of civil fraud.

Subcontractor" signed on Requisition 3 in mid-December 1994. The certificate on that requisition, signed by Zeytoonjian, swore that all vendors had been paid through the period for which Jackson had been paid on Requisition 2, i.e. November 4.[13] The Court ruled on December 23, 1997, when it dismissed Zeytoonjian from the case, that he did not act fraudulently when he made the certification. The evidence is that Zeytoonjian checked in with the office with one of the "girls" regarding the status of vendor payment before signing the certificate. There is no evidence that he spoke to Moretto or Gateman or that either one of them told one of the people in the office that all of the vendors had been paid. Furthermore, given the strong evidence that the corporate records of Jackson were still in a state of confusion as of mid-December, there is no evidence that anyone at Jackson knew that any vendors had not been paid for work performed on or before November 4, 1994. Finally, the evidence is unpersuasive that there were any aged, overdue accounts payable as of November 4, 1996. Since Hyman did not pay (and therefore did not rely) on Requisitions 4 and 5, neither certificate makes out a fraud claim. Hyman contends that defendants submitted falsely under-inclusive vendor lists to Hyman in an effort to conceal their mounting vendor bills, but the evidence does not demonstrate that Gateman and/or Moretto knowingly and fraudulently submitted, or caused to be submitted, vendor lists attached to requisitions 1, 2 or 3, which excluded unpaid vendors so as to deceive Hyman. Indeed, the evidence is unclear as to whether these early vendor lists were false or incomplete with respect to unpaid vendors. Although Hyman did prove that later vendors lists were false and incomplete, it paid *no money in reliance on those lists.*

The final fraudulent misrepresentation alleged by Hyman against the individuals is the writing of bad checks to Jackson vendors on the Post Office Project. The evidence necessarily limits these allegations as colorable "frauds" to the month of Febru-

ary 1995, because the occasional check on Jackson's account that bounced prior to then was reissued with sufficient funds. Though there is evidence that Moretto knew about the depletion of funds in the Jackson bank account by February, there is no evidence that Hyman relied on any "misrepresentation" through the writing of bad checks to its detriment, since the last payment by Hyman to Jackson was in mid-January. Payment on Requisition 4, which in the normal course would have been made in late February, was not made precisely because Hyman knew that Jackson was not paying its vendors, including the issuance of several checks returned for insufficient funds.

B. *Unfair and Deceptive Business Practices (Count IX)*

Hyman's c. 93A claim is based on these same "acts of fraud" (which, as discussed above, were not proven) and "willful breaches of the Agreement and the implied covenant of good faith and fair dealing." (Compl.¶ 98.) In its post-trial briefing, Hyman argues that the transfer of $129,600 from Jackson to Calvesco in January makes out a c. 93A claim, presumably because this transfer, by which the controlling persons of both companies preferred debts to Calvesco over debts to vendors, was a willful breach of contract. One of the three ways in which Hyman alleges that the subcontract was breached was by the defendants' "failing to pay their Vendors." (Compl.¶ 62.) As with fraud, a claim under c. 93A, § 11, which extends broadly to persons acting in a business context, may be asserted directly against Moretto and Gateman without the benefit of a veil-piercing. *See Bolen v. Paragon Plastics, Inc.,* 754 F.Supp. 221, 228 (D.Mass.1990) ("[C]orporate officers can be held liable for participating in unfair and deceptive business practices.") (citing *Nader v. Citron,* 372 Mass. 96, 103, 360 N.E.2d 870 (1977)); *Manning v. Zuckerman,* 388 Mass. 8, 10, 444 N.E.2d 1262 (1983). However, "mere breaches of contract, without more, do not violate Chapter 93A." *Pepsi–Cola,* 754 F.2d at 18; *see also Massachusetts Employ-*

---

**13.** Hyman concedes that the identical certificates on Requisitions 1 and 2 could not have been fraudulent for the simple reason that they were submitted simultaneously at a time when Hyman had not yet paid Jackson a dime.

*ers Ins. Exch. v. Propac–Mass, Inc.,* 420 Mass. 39, 43, 648 N.E.2d 435 (1995).

█ The transfer of the $129,600 may well constitute a breach of the contract with Hyman by virtue of those funds going to sources other than unpaid vendors. Whoever transferred the money—and it is clear that Moretto and Gateman either did it themselves, authorized it, or ratified the transfer thereafter—did so with a mind to favoring vendors on the Torrey projects, which Moretto and Gateman had personally bonded, over vendors on the Hyman project, which they had not. By January 17, when the transfer took place, Moretto and Gateman knew that many vendors were unpaid, and they unquestionably knew of their "contractual arrangement" and obligations to pay them. Nevertheless, all but $100,000 of the third requisition payment was taken out of the Jackson coffers. The transfer of $20,000 on February 13, 1995 from the payroll account to Joseph's Restaurant was also deeply troubling in light of the full awareness of the plight of the vendors.

However, viewing the evidence as a whole, Hyman has not proven that the January 17 transfer alone constitutes a violation of c. 93A for essentially the same reasons that veil-piercing was unjustified. First, Calvesco put almost as much money back in to Jackson over the next several weeks. Second, Hyman has not proven that Moretto and Gateman knew that this withdrawal would effect an inability to pay the vendors in the near future, given the anticipation of more payments from Hyman and payments on work on extras. Gateman's decision to leave the companies in January along with his promise to "finish up" the Torrey projects may have driven the decision to prefer those vendors then and save the Post Office vendors for later. Third, neither Gateman nor Moretto received any money personally from the transfer. Fourth, and most convincingly, Jackson continued to perform the contract for at least another six weeks, during which it at least tried to rectify the vendor problem. Even if Jackson breached an implied or express contractual term by not paying its vendors out of the Requisition 3 payment, there

is insufficient proof of something more than a mere breach as required by c. 93A, § 11.

Hyman argues that the transfer of $20,000 to the individuals via the investment in the restaurant was an asset-stripping which constitutes an unfair and deceptive practice because Jackson was financially destitute and Hyman was paying the payroll at that time. While this argument has merit, Hyman has not proven that any harm flowed from the this practice in light of the enormous sums of money it was withholding on the contract. It does, however, mitigate strongly against Moretto's Chapter 93A counterclaim, for to seek equity, a litigant must have clean hands.

III. *THE COUNTERCLAIM BY CHARLES AND CHRISTINE MORETTO*

█ The Morettos press their counterclaim under Mass.G.L. c. 93A, § 11, on the grounds that Hyman's lawsuit was "frivolous and without basis and was commenced and maintained as an attempt to coerce the payment of monies by [the Morettos] not due to [Hyman] through the exertion of unfair economic advantage." (Moretto's Mot. for Judgment at 1.) A party may bring a claim under c. 93A against another party which willfully filed a baseless lawsuit. *See Quaker State Oil Ref. Corp. v. Garrity Oil Co.,* 884 F.2d 1510, 1513–14 (1st Cir.1989); *Refuse & Envtl. Sys., Inc. v. Industrial Servs. of Am., Inc.,* 932 F.2d 37, 43 (1st Cir.1991) ("bringing the state lawsuit in spite of the evidence" is a willful commission of an unfair and deceptive business practice under c. 93A.)

█ The Morettos' counterclaim implodes for two reasons. First, it is impossible to characterize Hyman's claims as "baseless" or "groundless" given the facts, inter alia, that Jackson stopped paying its vendors, the primary point of contact, DeFeo, disappeared and both Calvesco and Jackson ceased to operate in short order. "The mere fact that [Hyman] did not prevail on its [claims] is no signal that the [claims] were groundless." *Quaker State,* 884 F.2d at 1513–14. While defendants complain DeBruyn did not issue joint checks, as promised, her reluctance was at least partially justified by Jackson's intransigence in pro-

viding any back up documents particularly with respect to vendors which worked at both the post office and Torrey sites. Her inexperience in managing a complex construction site (her first project) is a far cry from unfair and deceptive trade practices. While some of her decisions can be questioned by a Monday-morning quarterback, they were all made in good faith.

Second, there is insufficient evidence that Hyman's filing of the lawsuit was "motivated by any pernicious purpose collateral to winning the suit and ensuring payment of damages sustained." *Id.* at 1514. The Morettos assert that the verified complaint, signed by Morrissey, contained statements beyond his personal knowledge and that the private investigator hired by Hyman's counsel reported inaccurate facts, but neither of these pieces of evidence makes out a "documented attempt at wrongful exaction of something apart from [Hyman's] due, ergo, no 'extortion' (or anything sufficiently resembling it)." *Id.* More is required for the Morettos' counterclaim than a simple statement that the complaint contained allegations that ultimately were unprovable, as many of them were. "Whether or not the [allegations] now appear futile, [Hyman] had the right to test them through litigation." *Id.*

## ORDER OF JUDGMENT

(1) The Court **ORDERS** entry of default judgment for plaintiff George Hyman Construction Company as against defendants Calvesco, Inc., Iron Holdings, Inc. (d/b/a Charles A. Jackson Co.), and Anthony DeFeo pursuant to Fed.R.Civ.P. 55(b).

(2) The Court **ORDERS** entry of judgment for defendants Charles Moretto and Jackson Gateman on all counts of the complaint.

(3) The Court **DENIES** the Morettos' Motion for Judgment on its counterclaim and **ORDERS** entry of judgment for plaintiff George Hyman Construction Company on the counterclaim.

**SO ORDERED.**